*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

LEONARD S. EMBODY,

*Plaintiff-Appellant,*

v.

STEVE WARD,

*Defendant-Appellee.*

No. 11-5963

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cv-126—William J. Haynes, Jr., District Judge.

Argued: July 18, 2012

Decided and Filed: August 30, 2012

Before: SUTTON and GRIFFIN, Circuit Judges; DOWD, District Judge.[*]

————————————

## COUNSEL

**ARGUED:** Phillip L. Davidson, Nashville, Tennessee, for Appellant. Mary M. Bers, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Phillip L. Davidson, Nashville, Tennessee, for Appellant. Mary M. Bers, Dawn M. Jordan, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. Alan Gura, GURA & POSSESSKY, PLLC, Alexandria, Virginia, Jessica L. Ellsworth, HOGAN LOVELLS US LLP, Washington, D.C., for Amici Curiae.

————————————

## OPINION

————————————

SUTTON, Circuit Judge. Tennessee law allows individuals with gun permits to carry handguns in public places "owned or operated by the state" such as "public

———————————————————————————
[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

park[s]" and "natural area[s]." Tenn. Code § 39-17-1311(b)(1)(H). The statute defines a "handgun" as "any firearm with a barrel length of less than twelve inches" that is "designed, made or adapted" to be fired with one hand. *Id.* § 39-11-106(a)(16).

Armed with knowledge of this law and one thing more—a Draco AK-47 pistol—Leonard Embody went to Radnor Lake State Natural Area, a state park near Nashville, Tennessee, on a Sunday afternoon. Dressed in camouflage, he slung the gun with its eleven-and-a-half-inch barrel across his chest along with a fully loaded, thirty-round clip attached to it.

Embody anticipated his appearance at the park would attract attention—he carried an audio-recording device with him—and it did. One passer-by spontaneously held up his hands when he encountered Embody. Two park visitors reported to a park ranger that they were "very concerned" about Embody and the AK-47. R.22-3 at 5. And an elderly couple reported to a ranger that a man was in the park with an "assault rifle." *Id.* at 6.

Two more predictable things happened. A park ranger disarmed and detained Embody to determine whether the AK-47 was a legitimate pistol under Tennessee law, releasing him only after determining it was. And Embody sued the park ranger, claiming he had violated his Second, Fourth and Fourteenth Amendment rights.

For his troubles, Embody has done something rare: He has taken a position on the Second and Fourth Amendments that unites the Brady Center to Prevent Gun Violence and the Second Amendment Foundation. Both organizations think that the park ranger permissibly disarmed and detained Leonard Embody that day, notwithstanding his rights to possess the gun. So do we.

I.

Embody's appearance at the park prompted two encounters with park rangers. In the first, Ranger Joshua Walsh approached Embody, asked for his permit and questioned him about the gun. Embody produced a valid permit, but Walsh could not tell whether the firearm qualified as a legal one under state law. "Technically it's a

handgun," he told Embody, "but I don't know why you need it out here," and "I'm pretty sure an AK-47 is not a handgun." R.22-3 at 3. Uncertain how to proceed, Walsh allowed Embody to continue through the park—for the time being.

Walsh phoned a supervisor, Ranger Steve Ward, for further direction. Ward in turn called Chief Ranger Shane Petty, who did not believe the AK-47 was a handgun given the description of it. Petty and Ward determined that Ward should undertake a "felony take down" of Embody, disarm him and check the weapon. *Id.* at 9. They called the Metropolitan Nashville Police Department for assistance.

Ward found Embody in a parking lot and ordered him to the ground at gun point. Without arresting Embody, Ward removed the gun, patted him for other weapons and detained him. When the Nashville police officers arrived, Ward explained his concern that Embody's weapon was illegal, and the officers conducted a weapons check to determine the gun's status. Meanwhile, Embody requested the presence of a police supervisor, even after the Nashville officers advised him it would delay his release. Once the officers confirmed that the firearm fit the definition of a handgun under state law, Ward returned the gun to Embody and released him. The incident lasted about two-and-a-half hours.

Embody sued Ward for damages under 42 U.S.C. § 1983. He alleged that Ward had violated his Fourth Amendment rights by subjecting him to an unreasonable seizure and his Second Amendment rights by disarming and detaining him for carrying a weapon condoned by state law. The district court granted Ward's motion for summary judgment.

## II.

One question raised by this § 1983 action is whether Ward violated Embody's rights under the Fourth (and Fourteenth) Amendment, which protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. The rules governing such encounters are not new. Before conducting a temporary investigatory stop, a law enforcement officer must have a "reasonable" suspicion of criminal activity based on

"specific and articulable facts" known to the officer at the time of the stop.  *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  The length of the stop and the extent of intrusion must be "reasonably related in scope to the circumstances which justified the interference." *Id.* at 29.  Officers must "diligently pursue[] means of investigation that [are] likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Embody's AK-47, carried openly and fully loaded through a state park, gave Ward ample reason for suspicion that Embody possessed an illegal firearm.  The barrel was a half-inch shy of the legal limit, and, when coupled with the thirty-round ammunition clip, it reasonably could look more like a rifle than a handgun.  All of this explains the reactions of visitors to the park, who became frightened at the sight of a man in camouflage carrying an AK-47 across his chest, including one couple who reported a man with an "assault rifle."  R.22-3 at 6.  Making matters worse (or at least more suspicious), Embody had painted the barrel tip of the gun orange, typically an indication that the gun is a toy.  An officer could fairly suspect that Embody had used the paint to disguise an illegal weapon.  On this record, an officer could reasonably suspect something was amiss.

The scope of Ward's investigation also was reasonably related to the circumstances that justified the stop.  Ordering Embody to the ground at gun point was not an excessive intrusion given the existence of a loaded weapon, the risk to officer (or public) safety if Embody had been up to no good and the danger to law enforcement whenever it disarms an individual suspected of crime.  *See Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814–15 (6th Cir. 1999).  Although the rangers detained Embody for two-and-a-half hours, he points to no lack of diligence by Ward in trying to confirm (or allay) his suspicions. The officers took the time needed to determine whether the AK-47 was a handgun, whether Embody had a permit for it, whether he had illegally modified it and whether he posed any other safety threats.  A good part of the detention, moreover, came at the beck and call of Embody, who asked to speak to the police supervisor, even after being told it would delay his release.

Embody does not quarrel with this accounting of what happened.  To his mind, all that matters is that carrying an AK-47 pistol in a state park is legal under Tennessee law; the gun's resemblance to an assault rifle, the conspicuous arming of it, his military clothing and the concerns of passers-by add nothing.  But the constitutional question is whether the officers had reasonable suspicion of a crime, not whether a crime occurred.  Otherwise, all failed investigatory stops would lead to successful § 1983 actions.  Having worked hard to appear suspicious in an armed-and-loaded visit to the park, Embody cannot cry foul after park rangers, to say nothing of passers-by, took the bait.  The officers stopped him only as long as it took to investigate the legitimacy of the weapon and, at his insistence, bring the supervisor to the park.  No Fourth Amendment violation occurred.

III.

Embody's Second Amendment claim fares no better.  Noting that state law authorized him to carry this gun in the park, he argues that temporarily disarming him necessarily was a *"per se* Second Amendment violation."  Br. 10.  But § 1983 claims are designed to vindicate federal law, not state law.  He offers no explanation why the officers' alleged failure to comply with state law itself violates the United States Constitution in general or the Second Amendment in particular.  The "[m]ere violation of a state statute does not infringe the federal Constitution."  *Snowden v. Hughes*, 321 U.S. 1, 11 (1944).

To the extent Embody means to argue that the Second Amendment prevents Tennessee from prohibiting certain firearms in state parks (and thus prohibited Ward from detaining Embody on suspicion of possessing an illegal firearm), qualified immunity is the answer.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  No court has held that the Second Amendment encompasses a right to bear arms within state parks.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008) (individual right to bear arms in the home); *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) (upholding regulation prohibiting firearms in national parks).  Such a right may or may not exist, but the critical point for our purposes is that it has not been established—clearly or otherwise at this point.  That suffices to resolve this claim under the Court's qualified-immunity precedents.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

IV.

For these reasons, we affirm.