UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 11-5084
(3:10-cr-00206-MOC-1)

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

NATHANIEL BLACK

Defendant - Appellant

_____

O R D E R

_____

The court amends its opinion filed February 25, 2013, as follows:

On the cover sheet, district court information section, the name of Judge "Max O. Coburn, Jr." is changed to read Judge "Frank D. Whitney."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

v.

NATHANIEL BLACK,

     *Defendant-Appellant.*

No. 11-5084

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Frank D. Whitney, District Judge.
(3:10-cr-00206-MOC-1)

Argued: December 7, 2012

Decided: February 25, 2013

Before TRAXLER, Chief Judge, and
GREGORY and DAVIS, Circuit Judges.

---

Reversed and vacated by published opinion. Judge Gregory
wrote the opinion, in which Judge Davis joined. Chief Judge
Traxler wrote a separate opinion concurring in the result.

---

## COUNSEL

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS
OF WESTERN NORTH CAROLINA, INC., Charlotte, North
Carolina, for Appellant. Richard Lee Edwards, OFFICE OF

THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Henderson Hill, Executive Director, Elizabeth A. Blackwood, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

In *Terry v. Ohio*, Chief Justice Earl Warren recognized that police officers need discretion to perform their investigative duties. 392 U.S. 1 (1968). Since *Terry*, this discretion has been judicially broadened, giving police wide latitude to fulfill their functions. In some circumstances, however, police abuse this discretion, and we must remind law enforcement that the Fourth Amendment protects against unreasonable searches and seizures. Because in this case, we find the police disregarded the basic tenets of the Fourth Amendment, we reverse.

I.

In reviewing the denial of a motion to suppress, we view the facts in the light most favorable to the Government, as the party prevailing below. *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007). At approximately 10:00 p.m. on June 15, 2010, uniformed Officers Matthew Zastrow and Shane Strayer of the Charlotte-Mecklenburg Police Department were in a marked police vehicle, patrolling the Eastway Division of Charlotte, North Carolina. Certain apartment complexes in the Eastway Division are known for armed robberies and other violent crimes.

As the officers patrolled, they observed a vehicle parked at the pump of a gas station. Though neither officer saw the

vehicle pull into the gas station, during the approximately three-minute observation, the officers observed that the driver and sole occupant of the vehicle did not leave the car, pump gas, or go into the convenience store. Officer Zastrow believed this type of behavior was "unusual" and indicative of drug transactions. On this basis, the officers ran the license tag of the vehicle, which retrieved no outstanding traffic violations, and followed the vehicle as it traveled to a nearby parking lot located in between two apartment complexes.

At the parking lot, the officers observed the driver of the vehicle, later identified as Dior Troupe, park his vehicle and walk toward a group of five men in a semi-circle who were speaking and laughing with each other. Four of the men were standing, and an African-American male, later identified as Appellant Nathaniel Black, was sitting at the left-end of the semi-circle. The six men saw the police vehicle but did not react. Neither officer observed the men engaging in any criminal activity.

Officer Zastrow drove out of view and contacted other police units for assistance because he and Officer Strayer wanted to make "voluntary contact" with the men, and the officers believed it was unwise to do so if they were outnumbered. Officers Butler and Lang were in the immediate area and joined Officers Zastrow and Strayer in an adjacent parking lot. The four officers returned in their marked police vehicles to the same parking lot where they saw the men in the semi-circle. Three other officers, Fusco, Conner, and Harris, were also nearby in another apartment complex responding to a different call and later joined the first four officers.

At about 10:15 p.m., the four uniformed officers exited their marked patrol vehicles and started walking towards the men. Officers Zastrow and Strayer recognized one of the men in the group as Charles Gates. They had spoken with Gates two weeks prior to this incident about his residence in one of the nearby apartments. Officer Zastrow was aware of Gates'

prior felony drug arrests. Officer Strayer had previously arrested Gates for driving while intoxicated and drug offenses, and also knew Gates had been tased once by another officer. Neither officer knew whether Gates' prior arrests resulted in convictions.

As the officers approached the men, Troupe, who was closer to the officers, motioned to the officers with his hands indicating that he had a firearm in a holster on his hip, in plain view. Officer Strayer seized Troupe's firearm, obtained Troupe's driver's license, and secured the firearm in a patrol vehicle. Officer Strayer stated that although it is legal in North Carolina for a person to openly carry a firearm, in his years in the Eastway Division, he had never seen anyone do it.

Officer Zastrow testified he had been trained to operate on what he called the "Rule of Two," that is, if the police find one firearm, there will "most likely" be another firearm in the immediate area. Officer Strayer testified he had also been trained on what he referred to as the "one-plus" rule, that where there is one gun, there usually is another gun. Officer Strayer acknowledged that this "rule" was not always accurate as there are instances where a second gun is not always recovered.

After securing Troupe's gun in the police vehicle, Officer Strayer frisked Troupe, and proceeded to frisk the other men in the group. By this time, Officers Fusco and Conner had arrived at the scene, and a total of six officers were present.[1] Officers Fusco and Conner stood at a distance of about 10 to 15 feet from the men to ensure no other individuals walked up to the locale of the police encounter with the men.

---

[1]It is unclear when the seventh officer, Officer Harris, arrived at the scene.

While Officer Strayer was securing Troupe's gun, Officer Zastrow introduced himself to the men. He asked if any of the men lived in the apartments or if they were visiting. At that point, Appellant Black, who was still sitting, offered Officer Zastrow his North Carolina identification card. To Officer Zastrow, it was "unusual for someone to volunteer an ID" and the "remaining individuals in the group were argumentative and did not give any information, so it stood out that one volunteered an ID immediately." From his ID, Officer Zastrow believed that Black lived outside the Eastway Division. Black confirmed this belief by informing Officer Zastrow that he was visiting some friends in the area.

Officer Zastrow did not return Black's ID, instead, he pinned it to his uniform, and continued to obtain identification information from the other individuals. Officer Zastrow testified that the other individuals did not have physical identification so he wrote their names, addresses, and birthdates in a notebook.[2] Officer Zastrow described Black's behavior during this encounter as "extremely cooperative."

By this time, Officer Strayer had frisked Troupe and proceeded to frisk Nicolas Moses, who was standing at the right-end of the semi-circle. While Officer Strayer was frisking Moses, Officer Zastrow noticed that Black became "fidgety," sat forward in his chair, and "began looking left and right." In Officer Zastrow's training and experience, looking left and right is a "cue" that the individual is looking to flee. To Officer Fusco, who also observed this behavior, it indicates that the individual seeks a path to escape.

Black stood up, said he was going home, and began walking towards the apartments. Officer Zastrow, who was approximately five feet from Black, walked in front of Black

---

[2]We note that Officer Zastrow's testimony that the other men had no physical identification is contrary to Officer Strayer's testimony that he obtained physical ID from Troupe and Moses.

and told him that he was not free to leave and he should sit down. In response, Black said "I can't go home?" or "I can't leave?" and continued walking away.

Officer Zastrow then grabbed Black's left bicep with his left hand. According to Officer Zastrow, he could feel Black's "extremely fast" pulse through Black's t-shirt, which he believed was a sign of nervousness. Black pulled away from Officer Zastrow and began running towards an apartment building. Officers Zastrow and Fusco told Black to stop, and when he refused, they chased him. Officer Fusco grabbed Black from behind and tackled him to the ground. Officer Zastrow grabbed Black's wrist to try to handcuff him. As he did so, Officer Zastrow felt a metal object underneath Black's hand and clothing, which Officer Zastrow immediately recognized as a firearm. Officer Zastrow yelled "gun," and held on to Black's hand until the firearm fell to the ground. Officer Zastrow placed Black in handcuffs and arrested him.

Black was charged in a one-count indictment for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Black moved to suppress the firearm on the basis that it was the fruit of the unlawful seizure of his person. At a hearing on the motion to suppress, Black argued that he was unlawfully seized when he was told he could not leave, and the seizure was not supported by reasonable articulable suspicion. The Government relied on *California v. Hodari D.*, 499 U.S. 621 (1991), to argue that until Black's bicep was grabbed, he was not seized for Fourth Amendment purposes, and his seizure was supported by reasonable suspicion. The district court agreed with the Government and denied the motion.

Subsequently, Black entered a conditional plea of guilty and reserved his right to appeal the denial of his suppression motion. *See* Fed. R. Crim. P. 11(a)(2). At sentencing, the district court found that with a total offense level of 31, and a criminal history category of IV, Black's advisory guideline

range was 151 to 188 months. However, because Black was subject to a statutory minimum sentence of 180 months, *see* 18 U.S.C. § 924(e), the court sentenced Black to 180 months' imprisonment and three years of supervised release.

Black now appeals the denial of his motion to suppress, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review a district court's factual findings in a motion to suppress for clear error, and the legal determinations *de novo*. *United States v. Cain*, 524 F.3d 477, 481 (4th Cir. 2008).

III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 554 (1976)).

Although brief encounters between police and citizens require no objective justification, *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 1968), it is clearly established that an investigatory detention of a citizen by an officer must be supported by reasonable articulable suspicion that the individual is engaged in criminal activity. *Terry*, 392 U.S. at 21. In the case before us, we first consider when Black was "seized" for purposes of the Fourth Amendment, and then consider whether the seizure comports with the reasonable suspicion standard set forth in *Terry*.

## A.

A person is "seized" within the meaning of the Fourth Amendment if, "'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).[3] Specific factors to consider in determining whether a reasonable person would feel free to leave include: (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they "touched the defendant or made any attempt to physically block his departure or restrain his movement"; (v) "the use of language or tone of voice indicating that compliance with the officer's request might be compelled"; (vi) whether the officers informed the defendant that they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature"; and (vii) "whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it." *Mendenhall*, 446 U.S. at 554; *Gray*, 883 F.2d at 322-23. We have noted

---

[3]The Government argues that in determining whether a seizure occurred, we should apply the "force or submission" standard set forth in *Hodari D.*, where the Supreme Court stated, "[a]n arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority." 499 U.S. at 626 (emphasis omitted). The Government intends that in applying *Hodari D.*, we would reach the conclusion that Black was seized only when Officer Zastrow exerted physical force by grabbing Black's bicep. In *Brendlin v. California*, the Supreme Court clarified *Hodari D.*, stating that "[w]hen the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence," *Hodari D.*'s force or submission test yields to *Mendenhall*'s free to leave, totality of the circumstances test. 551 U.S. 249, 255 (2007). Here, we find that at the time the officers arrived and seized Troupe's gun, their actions did not convey an unambiguous intent to restrain Black, and Black's submission to the officers' authority was in essence passive acquiescence, and thus, *Mendenhall*, as opposed to *Hodari D.* applies.

that though not dispositive, "the retention of a citizen's identification or other personal property or effects is *highly material* under the totality of the circumstances analysis." *Weaver*, 282 F.3d at 310 (emphasis added).

Considering the totality of the following circumstances of this case, it is clear that when Officer Zastrow expressly told Black he could not leave, Black was *already* seized for purposes of the Fourth Amendment. First is the collective show of authority by the uniformed police officers and their marked police vehicles. The citizens observed a marked police vehicle drive to the parking lot, and then drive out of view. The police vehicle returned along with another marked police vehicle. Four uniformed officers approached the men, a number that quickly increased to six uniformed officers, and then seven. At least two of the officers were performing perimeter duties, ensuring that no other individuals interrupted the police interaction, and preventing the men from leaving the vicinity. Second, Officer Strayer had obtained Troupe's gun and secured it in his police vehicle, indicating that at the very least, Troupe was not free to leave. *See Weaver*, 282 F.3d at 310 (retention of personal property is highly material). Third, Officer Strayer had frisked Troupe and was frisking Moses; a reliable indicator that Officer Strayer would proceed to frisk the other men, and that the men were not free to leave until such action was completed. Fourth, and highly material, is the retention of Black's ID by Officer Zastrow, while Officer Strayer frisked other men in the group. *See id.*

These factors persuade us that long before he was told not to leave, Black was seized for purposes of the Fourth Amendment. Specifically, we hold that in view of all these circumstances, Black was seized at the point when Officer Zastrow pinned Black's ID to his uniform, while Officer Strayer frisked the men in the group. The verbal directive from the officers not to leave was not the initiation of the seizure, but rather an affirmation that Black was not free to leave. Black's subsequent decision to leave does not negate the finding that

a reasonable person in Black's circumstances would not feel free to leave. Instead, Black's decision to leave was an effort to terminate an illegal seizure.

We disagree with the Government's argument that all of Black's interactions with the police before his bicep was grabbed were consensual and do not implicate the Fourth Amendment. Though we do not reach this issue, we are doubtful that this encounter was consensual at its inception as the facts of this case are similar to our recent decision in *United States v. Jones*, 678 F.3d 293, 299, 301-04 (4th Cir. 2012), where we held that the defendant was seized prior to the beginning of the verbal interaction. Even assuming the encounter here was consensual at its inception, the increasing show of authority, immediate seizure of Troupe's gun, and frisk of the men in the group quickly changed the encounter to an investigatory detention. Because we hold that Black was seized for purposes of the Fourth Amendment when his ID was retained while his companions were frisked, we need not determine whether he was seized at any point prior to this.

B.

We next consider whether Black's seizure was reasonable. To be lawful, a *Terry* stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). The level of suspicion must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009). As such, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.[4] There is no reasonable suspicion merely by association.

---

[4]We believe the collective-knowledge doctrine issue raised in this case is fully addressed by our decision in *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011), and see no need to further address it.

Here, the totality of the factors outlined by the district court—an individual's presence at a gas station; prior arrest history of another individual; lawful possession and display of a firearm by another; Black's submission of his ID showing an out-of-district address to Officer Zastrow, all of which occurred in a high crime area at night—fails to support the conclusion that Officer Zastrow had reasonable suspicion to detain Black.[5]

At least four times in 2011, we admonished against the Government's misuse of innocent facts as indicia of suspicious activity. *See United States v. Powell*, 666 F.3d 180 (4th Cir. 2011); *Massenburg*, 654 F.3d 480; *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011); and *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011). Although factors "susceptible of innocent explanation," when taken together, may "form a particularized and objective basis" for reasonable suspicion for a *Terry* stop, *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002), this is not such a case. Instead, we encounter yet another situation where the Government attempts to meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion.

First, Officer Zastrow's suspicion that a lone driver at a gas pump who he did not observe drive into the gas station is engaged in drug trafficking borders on absurd.[6] Other than Troupe, there was no one else in the vehicle, and it defies reason to believe that Troupe was engaged in drug trafficking—

---

[5]The other factors the district court recited as establishing reasonable suspicion—that Black looked nervous as his companions were frisked; walked away from the scene after he was told not to; left his ID behind; and said he was going home but walked towards the apartment complexes he did not live in—are irrelevant because they occurred after Black was seized.

[6]Both parties are in accord, and we agree, that the district court erred in finding that the officers saw the vehicle pull into the gas station. This finding is unsupported by the officers' own testimonies.

an act that by definition involves transmitting drugs to another person. Moreover, by Officer Zastrow's own admission, he failed to include this gas station observation in his incident report on Black's arrest because he viewed them as separate incidents. In short, concluding that Troupe's presence in his vehicle at a gas station is suspicious is unreasonable.

Second, Gates' prior arrest history cannot be a logical basis for a reasonable, particularized suspicion as to Black. Without more, Gates' prior arrest history in itself is insufficient to support reasonable suspicion as to Gates, much less Black. *See Powell*, 666 F.3d at 188 ("[A] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." (citation omitted)). Moreover, we "ha[ve] repeatedly emphasized that to be reasonable under the Fourth Amendment, a search ordinarily must be based on *individualized* suspicion of wrongdoing." *DesRoches v. Caprio*, 156 F.3d 571, 574 (4th Cir. 1998) (quotation marks and alterations omitted) (emphasis added). In other words, the suspicious facts must be specific and particular to the individual seized. Exceptions to the individualized suspicion requirement "have been upheld only in 'certain limited circumstances,' where the search is justified by 'special needs'"—that is, concerns other than crime detection—and must be justified by balancing the individual's privacy expectations against the government interests. *Id.* (quoting *Chandler v. Miller*, 520 U.S. 305, 308, 313 (1997)); *see Treasury Employees v. Von Raab*, 489 U.S. 656, 665-66 (1989). Here, the Government has not identified any substantial interests that override Black's interest in privacy or that suppress the normal requirement of individualized suspicion.

Third, it is undisputed that under the laws of North Carolina, which permit its residents to openly carry firearms, *see generally* N.C. Gen. Stat. §§ 14-415.10 to 14-415.23, Troupe's gun was legally possessed and displayed. The Government contends that because other laws prevent convicted felons from possessing guns, the officers could not know whether Troupe was lawfully in possession of the gun until

they performed a records check. Additionally, the Government avers it would be "foolhardy" for the officers to "go about their business while allowing a stranger in their midst to possess a firearm." We are not persuaded.

Being a felon in possession of a firearm is not the default status. More importantly, where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states. *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993). Here, Troupe's lawful display of his lawfully possessed firearm cannot be the justification for Troupe's detention. *See St. John v. McColley*, 653 F. Supp. 2d 1155, 1161 (D.N.M. 2009) (finding no reasonable suspicion where the plaintiff arrived at a movie theater openly carrying a holstered handgun, an act which is legal in the State of New Mexico.) That the officer had never seen anyone in this particular division openly carry a weapon also fails to justify reasonable suspicion. From our understanding of the laws of North Carolina, its laws apply uniformly and without exception in every single division, and every part of the state. Thus, the officer's observation is irrational and fails to give rise to reasonable suspicion. To hold otherwise would be to give the judicial imprimatur to the dichotomy in the intrusion of constitutional protections.

Additionally, even if the officers were justified in detaining Troupe for exercising his constitutional right to bear arms, reasonable suspicion as to Troupe does not amount to, and is not particularized as to Black, and we refuse to find reasonable suspicion merely by association.

Fourth, with respect to the officers' "Rule of Two" or "one-plus rule," we would abdicate our judicial role if we took law enforcement-created rules as sufficient to establish reasonable suspicion. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonable-

ness' upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (citation and quotation marks omitted). As such, we must consider whether, in applying law enforcement rules, there are safeguards "to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." *Id.* at 655 (citation and quotation marks omitted).

Here, the practical implication of applying the so-called "Rule of Two" is that anyone in proximity to an individual with a gun is involved in criminal activity. Such a rule subjects to seizure or search anyone who actively or passively associates with a gun carrier. The seizure has no connection with the individual seized, the activity they are involved in, their mannerisms, or their suspiciousness; rather, the seizure is a mere happenstance of geography. The absurdity of this rule may be gleaned from scenarios where an individual carrying a firearm walks into a monastery subjecting to seizure all of the nuns and priests, or an ice-cream shop subjecting all of the patrons to a seizure. Or could police officers apply this rule to seize all individuals at a shooting range or on a hunting trip? The scenarios abound. As there are no safeguards against the unlawful use of discretion by the officer applying such an arbitrary and boundless rule, it cannot be a basis for reasonable suspicion of criminal activity.

Fifth, it is counterintuitive that Black provided a justification for reasonable suspicion by volunteering his ID to the officer. The Government characterizes Black's behavior as "overly" cooperative and cites cases outside this Circuit for the proposition that "a surprisingly high level of cooperation" though not dispositive, is a factor to consider for individualized suspicion. *See United States v. Bravo*, 295 F.3d 1002, 1007 (9th Cir. 2002); *United States v. Ozbirn*, 189 F.3d 1194, 1200 n.4 (10th Cir. 1999). The record indicates that three of the six men provided identification to the officers, thus,

Black's action could hardly be characterized as overly cooperative. Additionally, we have noted that this type of argument—that cooperation is a justification for reasonable suspicion—actually places a defendant in a worse position than if he had simply refused to cooperate altogether because the Supreme Court has "'consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" *Powell*, 666 F.3d at 189 n.10 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). In certain communities that have been subject to overbearing or harassing police conduct, cautious parents may counsel their children to be respective, compliant, and accommodating to police officers, to do everything officers instruct them to do. If police officers can justify unreasonable seizures on a citizen's acquiescence, individuals would have no Fourth Amendment protections unless they interact with officers with the perfect amount of graceful disdain.

Likewise, there is nothing suspicious about the fact that Black's ID revealed he lived outside the district. Black correctly informed the officers that he was visiting friends. If Black was untruthful or provided a false identification, then the officers may have had some minimal, but not dispositive, basis for reasonable suspicion.

The pertinent facts remaining in the reasonable suspicion analysis are that the men were in a high crime area at night. These facts, even when coupled with the officers' irrational assumptions based on innocent facts, fail to support the conclusion that Officer Zastrow had reasonable suspicion that Black was engaging in criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (though a relevant consideration, "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"). In our present society, the demographics of those who reside in high crime neighborhoods often consist of racial minorities

and individuals disadvantaged by their social and economic circumstances. To conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion.

## IV.

The facts of this case give us cause to pause and ponder the slow systematic erosion of Fourth Amendment protections for a certain demographic. In the words of Dr. Martin Luther King, Jr., we are reminded that "we are tied together in a single garment of destiny, caught in an inescapable network of mutuality," that our individual freedom is inextricably bound to the freedom of others. Thus, we must ensure that the Fourth Amendment rights of *all* individuals are protected.

Viewed in their totality, all the factors recited by the Government fail to amount to a reasonable suspicion justifying Black's seizure, and the district court erred in denying the motion to suppress. Therefore, we reverse the district court's ruling, and vacate Black's conviction and sentence.

*REVERSED AND VACATED*

TRAXLER, Chief Judge, concurring:

I concur in the result reached by the majority.