**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1547**

MICHAEL WALKER, individually,

Plaintiff – Appellant,

v.

B. E. DONAHOE, in his individual capacity,

Defendant – Appellee,

and

B. W. PAULEY, in his individual capacity,

Defendant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:18-cv-01523)

Argued: March 10, 2021                    Decided: July 7, 2021

Before KING, KEENAN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Keenan joined. Judge Richardson wrote an opinion concurring in the judgment.

**ARGUED:** John Hague Bryan, JOHN H. BRYAN, ATTORNEY AT LAW, Union, West Virginia, for Appellant. Adam Ketner Strider, BAILEY & WYANT, PLLC, Charleston,

West Virginia, for Appellees.  **ON BRIEF:**  Charles R. Bailey, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellees.

———————

KING, Circuit Judge:

Michael Walker initiated this 42 U.S.C. § 1983 action in late 2018 in the Southern District of West Virginia against Corporal Brian E. Donahoe of the Putnam County Sheriff's Department. Walker was stopped in Putnam County, West Virginia, in February 2018 while walking along a public road with an AR-15-style assault rifle. Corporal Donahoe briefly detained Walker to question him and confirm his eligibility to carry a firearm. By his lawsuit, Walker seeks damages for the allegedly unconstitutional seizure of his person. In March 2020, the district court ruled that there was reasonable suspicion supporting Donahoe's investigatory detention of Walker and awarded summary judgment to Donahoe. *See Walker v. Donahoe,* No. 3:18-cv-01523 (S.D. W. Va. Mar. 2, 2020), ECF No. 63 (the "Opinion"). Walker has appealed and, as explained below, we affirm.

I.

A.

On February 14, 2018, a week before Walker was stopped and detained, a 19-year-old gunman in Parkland, Florida, opened fire inside Marjory Stoneman Douglas High School with an AR-15-style assault rifle. The Parkland school shooting claimed the lives of 17 persons and wounded several others. That massacre received extensive national news coverage and was one of the deadliest school shootings in American history. The Parkland shooting serves as background for the events giving rise to this § 1983 action.

Also pertinent is that it is generally legal in West Virginia to openly carry firearms, including AR-15 and other semiautomatic assault rifles. Nevertheless, eligibility to possess

3

and carry firearms is subject to some limitations. For example, a state statute bars "a person under the age of 18 years who is not married or otherwise emancipated [from] possess[ing] or carry[ing] concealed or openly any deadly weapon." *See* W. Va. Code § 61-7-8 (providing exceptions for minors possessing deadly weapons on private property or for purposes of hunting). Moreover, federal law broadly prohibits the possession of firearms and ammunition by a person who has been convicted of a felony. *See* 18 U.S.C. § 922(g)(1).

The record reflects that Corporal Donahoe's investigatory detention of Walker arose from a 911 call on February 21, 2018. Specifically, a concerned citizen called 911 and reported a man with an assault rifle walking westbound along Route 33 (known as Teays Valley Road) through a suburban residential and commercial area in the unincorporated Scott Depot community of Putnam County. Donahoe and his colleague, Deputy Brandon W. Pauley, were dispatched to locate the armed man described by the 911 caller. From the caller's report, Donahoe and Pauley knew that Teays Valley Christian School was less than a mile ahead of the armed man. The school has about 300 students and operates as a kindergarten through high school.

From his vehicle, Deputy Pauley soon spotted the armed man — Walker — and directed him to a nearby driveway away from the Teays Valley Road traffic. Corporal Donahoe arrived in a separate vehicle at about that same time and stopped Walker before he reached the driveway. The Putnam County officers observed that Walker was heading toward Teays Valley Christian School, that he was wearing military-style clothing (including a black sleeveless shirt and camouflage pants), that he was carrying a backpack,

4

and that he had an uncased AR-15-style assault rifle on his back. Upon seeing Walker, the officers each believed that he could be under the age of 18. That was so, they later explained, because of Walker's youthful appearance and the fact that he was walking rather than driving. As it turned out, Walker was actually 24 years old.

Walker began using his cell phone at the outset to film his encounter with Corporal Donahoe and Deputy Pauley.[1] Walker's video shows that Donahoe, the senior officer on the scene, engaged with Walker while Pauley stood by. The video further reveals that Walker was largely polite but assertive, that he refused to answer several of Donahoe's questions, and that he challenged the officers' authority to stop and detain him. Walker said of his destination only that he was walking "up to a buddy's," and he initially declined to produce his identification papers but soon relented and provided them to Donahoe. Meanwhile, Walker steadfastly refused to provide information about his assault rifle and his reason for carrying it, though he proclaimed that he had "done nothing wrong" and was simply "walking up the road." Walker also said that he had walked along Teays Valley Road while armed several times before and that walking was his only means of transportation. He repeatedly asked Donahoe why he was stopped, whether he had broken any law or was suspected of a crime, and whether he was free to go or being detained.

For his part, Corporal Donahoe became heated toward Walker and even swore at him during their encounter. Donahoe got physically close to Walker but did not restrain

---

[1] A copy of Walker's video was provided to the district court and then submitted in this appeal with the parties' Joint Appendix (hereinafter abbreviated in citations as the "J.A.").

him, pat him down, or otherwise touch him or his assault rifle. After receiving Walker's identification papers showing his age, Donahoe called the Sheriff's dispatch office for a criminal history check to ascertain whether Walker had any criminal conviction that would disqualify him from carrying a firearm. Donahoe suggested to Walker that a law enforcement officer possesses the authority to conduct a background check on any person carrying a firearm. At one point, Donahoe advised Walker that "I have the absolute legal right to see whether you're legal to carry that gun or not." When Walker asked Donahoe if he was being detained, Donahoe indicated that Walker could not leave until Donahoe gave permission.

The Sheriff's dispatch office promptly responded to Corporal Donahoe's request for a criminal history check and reported that Walker had been convicted of a misdemeanor drug offense and acquitted of a charge of obstructing a law enforcement officer. Thus believing that Walker was eligible to carry a firearm, Donahoe returned Walker's identification papers and told him that he was free to go. The entire encounter lasted less than nine minutes.

Notably, during his interaction with Walker, Corporal Donahoe referenced the 911 caller's report of an armed man walking along Teays Valley Road. Donahoe did not mention any suspicion that Walker might be heading to Teays Valley Christian School to perpetrate a mass shooting. In these proceedings, however, Donahoe testified that he "knew [the Parkland school shooting had just] happened" and it was "in the back of [his] mind." *See* J.A. 166. Indeed, both Donahoe and Deputy Pauley said they were on heightened alert for possible "copycat" crimes. *See id.* at 173-74, 235. Donahoe

6

acknowledged having been aware that, once he let Walker go, Walker "was still going to be heading that way [toward the school] with an assault rifle." *Id.* at 175. Donahoe and Pauley did not make any effort to follow or further investigate Walker, and the officers have since expressed the belief that there was nothing more they could do once Walker's criminal history check revealed no ground for his continued detention.

In his testimony in these proceedings, Walker explained that he was not licensed to drive because he suffered from epilepsy. According to Walker, when he was stopped and detained on February 21, 2018, he was in the midst of a 15-minute walk from his home to a friend's house to go coyote hunting. He stated that he did not know where the coyote hunt was to occur and that it did not happen because his friend was not "able to find his coyote call." *See* J.A. 240. Walker also testified that, in addition to the "AR-15 on [his] back," he was carrying a concealed "side arm." *Id.* He admitted that the Parkland school shooting had "occurred the same week," that he was walking "less than a mile away from Teays Valley Christian School," that "open carry in West Virginia is only legal for people over the age of 18," and that he was regularly "carded" while buying cigarettes. *Id.* at 242, 244. Nonetheless, Walker insisted that there was no reason to suspect him of committing any crime.

B.

On December 17, 2018, Walker filed his Complaint in federal court in Huntington, West Virginia, alleging the § 1983 claim against Corporal Donahoe, in his individual capacity, that the investigatory detention contravened the Fourth Amendment. After pretrial proceedings that included discovery, the parties submitted cross-motions for

7

summary judgment. For reasons explained in its Opinion of March 2, 2020, the district court awarded summary judgment to Donahoe.[2]

The district court ruled that Corporal Donahoe's seizure of Walker was not unconstitutional in that there was "reasonable suspicion to stop Walker and the extent of the intrusion and length of the stop were reasonable." *See* Opinion 10. In assessing the justification for the investigatory detention, the court considered the facts known to Donahoe under the "objective reasonable suspicion standard." *Id.* at 5. The court was also mindful of the principle that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention." *Id.* (quoting *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013)).

According to the district court, there was "something 'more'" to justify Corporal Donahoe's investigatory detention of Walker for two reasons. *See* Opinion 6. The court first determined that "Donahoe had reasonable suspicion that Walker was violating West Virginia Code § 61-7-8, which prohibits minors under the age of eighteen from carrying firearms." *Id.* That was because of Walker's "youthful appearance and the fact that he was walking rather than driving." *Id.*

The district court next concluded that "the facts within Donahoe's knowledge constituted reasonable suspicion that Walker posed an imminent threat to students and staff

---

[2] In his Complaint, Walker also named Deputy Pauley as a defendant and asserted that he was liable under § 1983 as a bystander of Corporal Donahoe's unconstitutional conduct. The district court granted summary judgment to Pauley, and Walker does not contest that ruling on appeal.

at Teays Valley Christian School." *See* Opinion 6. In so concluding, the court emphasized the following: the Parkland school shooting had just occurred, "prompting Donahoe and any reasonable officer to be on heightened alert for copycat crimes"; the sight of Walker caused "a concerned citizen [to call 911] to report seeing a man with a gun walking down the street"; Walker was stopped "less than a mile from [Teays Valley Christian School] as [he] headed in the school's direction"; he "was dressed in a black shirt and camouflage pants"; he was carrying an AR-15-style assault rifle, a type of firearm "frequently used in mass shootings, including the school shooting in Parkland"; and Walker's youthful appearance and the fact that he was walking suggested that he could be "of high-school age and a student at Teays Valley Christian School." *Id.* at 6-7.

Because Corporal Donahoe's investigatory detention of Walker was supported by reasonable suspicion (and because the scope of the investigation and duration of the detention were reasonable), the district court ruled that Corporal Donahoe was entitled to summary judgment on Walker's Fourth Amendment claim. *See* Opinion 10.[3]

---

[3] The district court further ruled that Corporal Donohoe would yet be entitled to summary judgment even if the court considered evidence that Walker had belatedly sought to introduce. *See* Opinion 10. The court recounted that it had "denied admission of the evidence because Walker was inexcusably negligent by not producing the evidence earlier." *Id.* The excluded evidence — that the investigatory detention occurred around 6:00 p.m. — contradicted Walker's prior testimony that he had encountered Donahoe during the morning hours of February 21, 2018. *See* J.A. 241 (Walker's testimony that the encounter occurred in the morning and that "it was a beautiful day" and "sunny").

In ruling that the excluded evidence would not affect Corporal Donohoe's entitlement to summary judgment, the district court accepted that "[e]stablishing that the stop occurred near 6:00 p.m. would lessen reasonable suspicion that Walker posed a threat of a school shooting." *See* Opinion 10. The court explained, however, that "reasonable (Continued)

9

Alternatively, the court ruled that Donahoe was protected by qualified immunity, in that his conduct did not violate a clearly established constitutional right. *See id.* at 12 (explaining that "[i]f a constitutional violation may have occurred, the Court considers whether the constitutional right was 'clearly established,' meaning 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted'" (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). Walker has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal, Walker challenges the district court's ruling that Corporal Donohoe did not violate Walker's Fourth Amendment rights, as well as the court's alternative ruling that Donahoe was at least entitled to qualified immunity. As Walker would have it, the court's conclusion that reasonable suspicion supported Donahoe's investigatory detention of Walker was patently contrary to controlling precedent, particularly our decision in *United States v. Black*, 707 F.3d 531 (4th Cir. 2013). Notably, Walker does not contend that the

suspicion that Walker was violating § 61-7-8 would still apply." *Id.* Additionally, the court recognized that "the circumstances of the encounter were sufficiently unusual to arouse suspicion that Walker posed a threat." *Id.* The court elaborated that "there was no obvious reason" for "Walker's possession of an AR-15-style rifle under these circumstances," as "AR-15s are not commonly carried for self-defense" or "traditionally used for hunting." *Id.* at 11. Addressing the excluded evidence, the court also observed that "[s]eeing Walker at 6:00 p.m. in February in an urban area would further diminish an inference that Walker possessed the rifle for hunting because the sun would soon set and hunting after dark is generally prohibited." *Id.*

10

court erred in deeming the scope of the investigation and the duration of the detention to be reasonable.

We review de novo the district court's award of summary judgment to Corporal Donahoe, viewing the facts in the light most favorable to Walker. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 340-41 (4th Cir. 2000). Because we affirm the summary judgment award on the ground that there was reasonable suspicion for the investigatory detention and therefore no constitutional violation, we do not reach and review the court's alternative qualified immunity ruling.

## A.

As a background for our analysis, we begin with a review of relevant legal principles. The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." *See* U.S. Const. amend. IV. To be constitutional, a warrantless investigatory detention generally requires "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *See Reid v. Georgia*, 448 U.S. 438, 440 (1980). In assessing reasonable suspicion, "we view the totality of the circumstances to determine whether the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *See United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the

11

officer] to determine whether he thought that the facts constituted reasonable suspicion."
*See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

In our *Black* decision in 2013, we were called upon to determine whether reasonable suspicion supported the investigatory detention of the defendant (Black), who was convicted under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. *See* 707 F.3d at 536-37. Black had been carrying the concealed firearm while among a group of six men who were stopped, questioned, and frisked by police officers in Charlotte, North Carolina. *Id.* at 534-36. He sought to suppress the evidence of the firearm, which the officers found during the investigatory detention, as the fruit of the illegal seizure of his person. *Id.* at 536. The government identified several circumstances that arguably engendered reasonable suspicion to support the officers' investigatory detention of Black, including that one of the other men in Black's group (Troupe) was openly carrying a handgun. *Id.* at 535 (relating that Troupe "had a firearm in a holster on his hip, in plain view").

We rejected the government's theory that Troupe's possession of a firearm was a circumstance creating reasonable suspicion to stop and detain Black. In so doing, "we refuse[d] to find reasonable suspicion merely by association." *See Black*, 707 F.3d at 540. Of particular relevance here, we also concluded that Troupe's firearm was an insufficient basis to stop and detain Troupe himself. *Id.*

In that regard, we emphasized that it was "undisputed that under the laws of North Carolina, which permit its residents to openly carry firearms, Troupe's gun was legally possessed and displayed." *See Black*, 707 F.3d at 540. We also recognized that the

12

officers' lack of knowledge as to "whether Troupe was lawfully in possession of the gun" could not warrant a criminal history check, in that "[b]eing a felon in possession of a firearm is not the default status." *Id.* Rather, we pronounced that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention." *Id.* "Permitting such a justification," we explained, "would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." *Id.*

As for whether there was something "more" about Troupe's possession of a firearm to justify an investigatory detention, we concluded that there was not. We specifically ruled that it was insufficient that Troupe was the first person an officer had seen openly carrying a firearm in that police division of Charlotte. *See Black*, 707 F.3d at 540. That was because "the laws of North Carolina . . . apply uniformly and without exception in every single division, and every part of the state." *Id.* We separately dismissed as insufficient circumstances related directly to Black, including that Black at first seemed "'overly' cooperative," that he volunteered his identification papers to the officers, and that he lived outside the division. *Id.* at 541-42. Consequently, we determined that the evidence of Black's firearm must be suppressed and his conviction vacated.

B.

We turn to Walker's argument that our *Black* decision compels the conclusion that Corporal Donahoe's investigatory detention of Walker contravened the Fourth Amendment. According to Walker, *Black* holds that "[l]awful firearm possession and use in West Virginia cannot form the basis of reasonable suspicion to perform a stop and

13

investigatory detention." *See* Br. of Appellant 24. Walker further contends that "[t]here is no lawful basis . . . to treat an AR-15 style rifle with any less measure of protection under the holding of . . . *Black* as is granted to any other lawful firearm under state law." *Id.* at 28.

Contrary to Walker's interpretation, the *Black* decision does not dictate that, in a state like West Virginia where it is legal to openly carry a firearm, the act of openly carrying a firearm can never engender reasonable suspicion. Indeed, *Black* explicitly allows that the possession of a firearm, though lawful, can contribute to reasonable suspicion in the totality of the circumstances. That is, the possession of a firearm plus something "more" may "justify an investigatory detention." *See Black*, 707 F.3d at 540 (articulating that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention").

The notion that lawful conduct can contribute to reasonable suspicion is hardly shocking or controversial. The *Black* decision itself cautions against the "misuse of innocent facts as indicia of suspicious activity," but acknowledges that "factors 'susceptible of innocent explanation,' when taken together, may 'form a particularized and objective basis' for reasonable suspicion." *See* 707 F.3d at 539 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). In his appellate brief, Corporal Donahoe helpfully points to cases in which the possession of a baseball bat and a golf club, when viewed in the context of all the circumstances, justified an investigatory detention. *See United States v. DeJear*, 552 F.3d 1196, 1201 (9th Cir. 2009) ("[T]he backseat passenger was holding an object that could be used as a weapon — a baseball bat."); *United States v. Ivy*, 224 F.

14

App'x 461, 464 (6th Cir. 2007) ("Ivy was loitering [in a gas station parking lot] with a golf club . . . ."). It mattered not that baseball bats and golf clubs — like firearms in West Virginia — have a multitude of "innocent uses" and "are indisputably legal to possess" and "legal to carry in public." *See* Br. of Appellee 43.

Walker is also incorrect in reading the *Black* decision to prohibit consideration of the type of firearm at issue in the reasonable suspicion inquiry. Plainly, the type of firearm being openly carried in *Black* — a handgun in a hip holster — was relevant to our conclusion that "Troupe's lawful display of his lawfully possessed firearm cannot be the justification for Troupe's detention." *See* 707 F.3d at 540. That relevance is evidenced, in part, by our invocation of a New Mexico district court decision "finding no reasonable suspicion where the plaintiff arrived at a movie theater openly carrying a holstered handgun, an act which is legal in the State of New Mexico." *Id.* (citing *St. John v. McColley*, 653 F. Supp. 2d 1155, 1161 (D.N.M. 2009)).

Moreover, the proposition that an AR-15-style assault rifle may be treated differently than a handgun is consistent not only with *Black*, but also with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and this Court's subsequent decision in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.) (en banc), *cert. denied*, 138 S. Ct. 469 (2017). In *Heller* in 2008, the Supreme Court determined that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *See* 554 U.S. at 592. The Court emphasized, however, that "the right secured by the Second Amendment is not unlimited," in that, inter alia, it "extends only to certain types of weapons." *Id.* at 623, 626. The Court easily concluded that the District of

15

Columbia's prohibition against the possession of handguns in the home was unconstitutional, as handguns are "the most preferred firearm in the nation to keep and use for protection of one's home and family." *Id.* at 628-29 (internal quotation marks omitted). But the Court concomitantly specified that "weapons that are most useful in military service — M-16 rifles and the like — may be banned" without infringement upon the Second Amendment right. *Id.* at 627.

Thereafter, in *Kolbe* in 2017, we considered the constitutionality of the State of Maryland's ban on AR-15 and other semiautomatic assault rifles. Applying *Heller*, we formulated the dispositive question as follows: "Are the banned assault weapons . . . 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" *See Kolbe*, 849 F.3d at 136 (quoting *Heller*, 554 U.S. at 627). Based on the evidence before us, we observed that the banned assault rifles have "military combat features" according "a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." *Id.* at 125 (internal quotation marks omitted). We therefore recognized that the banned assault rifles "are clearly most useful in military service," leaving us "compelled by *Heller* to recognize that those weapons . . . are not constitutionally protected." *Id.* at 137.

Of course, whereas the *Heller* and *Kolbe* decisions concerned the constitutionality of firearm prohibitions under the Second Amendment, Walker raises the issue in this case of whether the lawful possession of a firearm, and the type of that firearm, can contribute to reasonable suspicion under the Fourth Amendment. Nevertheless, *Heller* and *Kolbe* are

16

instructive. Along with *Black*, they convey that different firearms have different features, capabilities, and typical uses — particularly when comparing handguns to AR-15 and other assault rifles — that are appropriately considered in a reasonable suspicion analysis. *See* Br. of Appellee 43 (asserting that the same is true of sporting equipment like baseball bats and golf clubs, in that "it would be silly to require police to treat their presence the same as they would that of a badminton racquet or a ping pong paddle").

C.

Finally, having determined that Walker's possession of a firearm can be a circumstance justifying Corporal Donahoe's investigatory detention of Walker, we assess whether there actually was reasonable suspicion of criminal activity based on the totality of the circumstances. That is, we consider whether there was something "more" than the fact that Walker was openly carrying a firearm to warrant the seizure. *See Black*, 707 F.3d at 540. Our examination of the record leads us to agree with the district court that Donahoe had reasonable suspicion that Walker was intent on perpetrating a mass shooting at Teays Valley Christian School.

The 911 call about Walker — though insufficient alone to create reasonable suspicion — substantiates the perception that something was amiss. And indeed, the totality of the circumstances made it reasonable for Corporal Donahoe to suspect that a school shooting was afoot. *Cf., e.g.*, *Deffert v. Moe*, 111 F. Supp. 3d 797, 809 (W.D. Mich. 2015) (concluding that reasonable suspicion for an investigatory detention existed where the plaintiff "was walking in a residential neighborhood across the street from a church in service on a Sunday morning"; "[h]e was wearing camouflage pants and an FNP-45

Tactical pistol secured in a leg holster, with a TLR-2 rail mounted tactical light with a laser sight attached to the pistol"; and his "appearance and behavior, which included singing 'Hakuna Matata' loudly enough to be heard from a police cruiser, was sufficiently alarming to a resident to call 911"). Simply put, the circumstances of Walker's firearm possession were unusual and alarming enough to engender reasonable suspicion.

First, as heretofore explained, it is proper to consider the type of firearm that Walker was carrying — an AR-15-style assault rifle. As Corporal Donahoe emphasizes, such rifles have been "the weapon of choice for the deadliest mass shooters of the past decade." *See* Br. of Appellee 27-28 (explaining that "AR-15 style rifles give the wielder the capability to kill more people in a shorter amount of time than more commonplace [firearms], making it an appealing choice for a would-be mass shooter . . . and a greater danger to public safety than would more commonplace, less-powerful, lower-capacity firearms, such as shotguns or handguns"). Donahoe points to the massacres since 2012 at a movie theater in Aurora, Colorado; at Sandy Hook Elementary School in Newtown, Connecticut; at a holiday party in San Bernardino, California; at the Pulse nightclub in Orlando, Florida; at a music festival in Las Vegas, Nevada; at a church in Sutherland Springs, Texas; and at Marjory Stoneman Douglas High School in Parkland, Florida.

Second, the Parkland school shooting occurred just a week before Walker was stopped and detained while carrying an AR-15-style rifle. As would be expected, Corporal Donahoe said that he had been on heightened alert for possible copycat crimes. And significantly, the Parkland shooter used an AR-15-style assault rifle to kill and injure his victims. *Cf. Kilpatrick v. United States*, 432 F. App'x 937, 939 (11th Cir. 2011)

18

(recognizing that "[i]t is not unreasonable for a law enforcement officer to be sensitive to copycat crimes" and concluding that officers "had more than adequate Fourth Amendment grounds to stop Kilpatrick after she drove her van, covered with negative written references to the ATF and Waco, through the ATF parking lot on the anniversary of the Waco fire and the Oklahoma City bombing").

Third, Walker was walking toward and within a mile of Teays Valley Christian School. Although Walker argues that location is an improper consideration under our *Black* decision, *Black* did not so hold. Rather, *Black* ruled that no reasonable suspicion arose from the mere fact that a handgun was being openly carried in a location where an officer had not seen that done before. *See* 707 F.3d at 540. Moreover, the Supreme Court has recognized that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Fourth, Walker was dressed to look like a soldier, in a black sleeveless shirt and camouflage pants. *See Embody v. Ward*, 695 F.3d 577, 580-81 (6th Cir. 2012) (concluding that military-style clothing contributed to reasonable suspicion justifying investigatory detention of plaintiff while he was openly carrying firearm); *Deffert*, 111 F. Supp. 3d at 809 (same).

And fifth, Walker was walking rather than driving, suggesting that he might be a minor and perhaps a student at Teays Valley Christian School. According to Corporal Donahoe, Walker had a youthful appearance, though Walker contends that he did not have such an appearance and that there is a genuine issue of material fact as to how old he

19

looked. In any event, there is no suggestion that Walker appeared older than he actually was (24 years) or that his age somehow excluded him from reasonable suspicion of being a prospective school shooter.[4]

Walker is left with the argument that because Corporal Donahoe did not mention any potential criminal activity related to Teays Valley Christian School during his investigatory detention of Walker, Donahoe cannot now rely on the existence of reasonable suspicion that Walker posed a threat to the school. That argument is foreclosed, however, by the principle that "reasonable suspicion is an objective test" based on "the facts within the knowledge of" the officer and not the officer's "subjective beliefs." *See Foreman*, 369 F.3d at 781; *see also United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (explaining that "if sufficient objective evidence exists to demonstrate reasonable suspicion," an investigatory detention "is justified regardless of a police officer's subjective intent"). Here, there is ample objective evidence demonstrating reasonable suspicion.

---

[4] Because we agree with the district court that Corporal Donahoe had reasonable suspicion that Walker was intent on perpetrating a mass shooting at Teays Valley Christian School, we do not unnecessarily decide the issue of whether Donohoe had reasonable suspicion that Walker was under the age of 18 and thus illegally carrying a firearm. We also do not review the court's exclusion of belatedly introduced evidence as to the time of Walker's encounter with Donahoe, *see supra* note 3, as Walker has not preserved any challenge to that ruling on appeal.

## III.

Pursuant to the foregoing, we affirm the summary judgment award made by the district court in favor of Corporal Donahoe.

*AFFIRMED*

RICHARDSON, Circuit Judge, concurring in the judgment:

I would affirm the district court's grant of summary judgment based on the officer's qualified immunity. *Cf. United States v. Black*, 707 F.3d 531, 539–40 (4th Cir. 2013).