ON REHEARING EN BANC
PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 14-4902

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHAQUILLE MONTEL ROBINSON,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. Gina M. Groh, Chief District Judge. (3:14-cr-00028-GMG-RWT-1)

———————

Argued: September 22, 2016      Decided: January 23, 2017

———————

Before GREGORY, Chief Judge, WILKINSON, NIEMEYER, MOTZ, TRAXLER, KING, SHEDD, DUNCAN, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

———————

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Wilkinson, Judge Traxler, Judge King, Judge Shedd, Judge Duncan, Judge Agee, Judge Keenan, Judge Diaz, Judge Floyd, and Judge Thacker joined. Judge Wynn wrote a separate opinion concurring in the judgment. Judge Harris wrote a dissenting opinion, in which Chief Judge Gregory, Judge Motz, and Senior Judge Davis joined.

———————

**ARGUED:** Nicholas Joseph Compton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. Thomas

Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kristen M. Leddy, Research and Writing Specialist, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. William J. Ihlenfeld, II, United States Attorney, Jarod J. Douglas, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

---

NIEMEYER, Circuit Judge:

This appeal presents the question of whether a law enforcement officer is justified in frisking a person whom the officer has lawfully stopped and whom the officer reasonably believes to be armed, regardless of whether the person may legally be entitled to carry the firearm. Stated otherwise, the question is whether the risk of danger to a law enforcement officer created by the forced stop of a person who is armed is eliminated by the fact that state law authorizes persons to obtain a permit to carry a concealed firearm.

After receiving a tip that a man in a parking lot well known for drug-trafficking activity had just loaded a firearm and then concealed it in his pocket before getting into a car as a passenger, Ranson, West Virginia police stopped the car after observing that its occupants were not wearing seatbelts. Reasonably believing that the car's passenger, Shaquille Robinson, was armed, the police frisked him and uncovered the firearm, leading to his arrest for the possession of a firearm by a felon.

During his prosecution, Robinson filed a motion to suppress the evidence recovered as a result of the frisk, contending that the frisk violated his Fourth Amendment rights. The officers, he argued, had no articulable facts demonstrating that he was dangerous since, as far as the officers knew, the State could

3

have issued him a permit to carry a concealed firearm. After the district court denied the motion to suppress, Robinson pleaded guilty to the illegal possession of a firearm, reserving the right to appeal the denial of his motion to suppress.

On appeal, Robinson contends again that the information that police received from the tip described seemingly innocent conduct and that his conduct at the time of the traffic stop also provided no basis for officers to reach the conclusion that he was dangerous. He argues, "Under the logic of the district court, in any state where carrying a firearm is a perfectly legal activity, every citizen could be dangerous, and subject to a Terry frisk and pat down."

We reject Robinson's argument and affirm, concluding that an officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on the scene. See Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) (per curiam). The Fourth Amendment does not "require . . . police officers [to] take unnecessary risks in the performance of their duties." Terry v. Ohio, 392 U.S. 1, 23 (1968). And it is inconsequential that the person thought to be armed was a passenger. See Maryland v. Wilson, 519 U.S. 408, 414 (1997). It is also inconsequential that the passenger may have had a permit to carry the concealed firearm.

4

The danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession. See Adams v. Williams, 407 U.S. 143, 146 (1972); Michigan v. Long, 463 U.S. 1032, 1052 n.16 (1983).

I

The material facts in this case are not disputed. At about 3:55 p.m. on March 24, 2014, an unidentified man called the Ranson, West Virginia Police Department and told Officer Crystal Tharp that he had just "witnessed a black male in a bluish greenish Toyota Camry load a firearm [and] conceal it in his pocket" while in the parking lot of the 7-Eleven on North Mildred Street. The caller advised Officer Tharp that the Camry was being driven by a white woman and had "just left" the parking lot, traveling south on North Mildred Street.

The 7-Eleven on North Mildred Street is adjacent to the Apple Tree Garden Apartments, and the area constitutes the highest crime area in Ranson. One officer who testified said that in his short one and a half years as a state trooper, he had experience with at least 20 incidents of drug trafficking in the 7-Eleven parking lot. Another officer testified that "when [she] was doing drug work[,] . . . [she] dropped an informant off to buy drugs" at the 7-Eleven parking lot and observed

5

"three other people waiting for drugs in that parking lot." She added that she had personally received "numerous complaints" of people running between the parking lot and the apartment complex, making drug transactions. Another officer testified that "[a]nytime you hear Apple Tree or 7-Eleven, your radar goes up a notch." Accordingly, when the Ranson Police Department received the tip about someone loading a gun in the 7-Eleven parking lot, its officers' "radar [went] up a notch," and the officers went "on heightened alert."

While still on the telephone with the caller, Officer Tharp relayed the information to Officer Kendall Hudson and Captain Robbie Roberts. Hudson immediately left the station to respond to the call, and Roberts left soon thereafter to provide backup.

When Officer Hudson turned onto North Mildred Street a short time later, he observed a blue-green Toyota Camry being driven by a white woman with a black male passenger. Noticing that they were not wearing seatbelts, Hudson effected a traffic stop approximately seven blocks, or three-quarters of a mile, south of the 7-Eleven. He estimated that the traffic stop took place two to three minutes after the call had been received at the station.

After calling in the stop, Officer Hudson approached the driver's side of the vehicle with his weapon drawn but carried below his waist and asked the driver for her license,

6

registration, and proof of insurance. He also asked the male passenger, the defendant Robinson, for his identification but quickly realized that doing so was "probably not a good idea" because "[t]his guy might have a gun[,] [and] I'm asking him to get into his pocket to get his I.D." Instead, Officer Hudson asked Robinson to step out of the vehicle.

At this point, Captain Roberts arrived and opened the front passenger door. As Robinson was exiting the vehicle, Captain Roberts asked him if he had any weapons on him. Instead of responding verbally, Robinson "gave [Roberts] a weird look" or, more specifically, an "'oh, crap' look[]." Roberts took the look to mean, "I don't want to lie to you, but I'm not going to tell you anything [either]." At this point, Captain Roberts directed Robinson to put his hands on top of the car and performed a frisk for weapons, recovering a loaded gun from the front pocket of Robinson's pants. After conducting the frisk, Roberts recognized Robinson, recalled that he had previously been convicted of a felony, and arrested him.

After Robinson was charged with the illegal possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), he filed a motion to suppress the evidence of the firearm and ammunition seized during the frisk, arguing that the frisk violated his Fourth Amendment rights.

7

The district court denied the motion, concluding that the officers possessed reasonable suspicion to believe that Robinson was armed and dangerous. Relying on Navarette v. California, 134 S. Ct. 1683 (2014), the court concluded that the anonymous caller's eyewitness knowledge and the contemporaneous nature of the report indicated that the tip was sufficiently reliable to contribute to the officers' reasonable suspicion. The court explained that the "anonymous tip that [Robinson] [had] recently loaded a firearm and concealed it on his person in a public parking lot in a high-crime area," as well as Robinson's "weird look and failure to verbally respond to the inquiry whether he was armed," gave rise to a reasonable suspicion that Robinson was armed and dangerous.

Robinson thereafter pleaded guilty to the firearm possession charge, reserving his right to appeal the district court's denial of his suppression motion, and the district court sentenced him to 37 months' imprisonment. Robinson appealed the denial of his motion to suppress, and a panel of this court reversed the district court's decision denying Robinson's motion to suppress and vacated his conviction and sentence. United States v. Robinson, 814 F.3d 201, 213 (4th Cir. 2016). By order dated April 25, 2016, we granted the government's petition for rehearing en banc, which vacated the panel's judgment and opinion. See 4th Cir. Local R. 35(c).

8

Robinson's appeal is defined as much by what he concedes as by what he challenges. Robinson rightfully acknowledges that the Ranson police had the right to stop the vehicle in which he was a passenger after observing a traffic violation, see Whren v. United States, 517 U.S. 806, 819 (1996), and also that they had the authority to direct him to exit the vehicle during the valid traffic stop, see Wilson, 519 U.S. at 415. He also correctly concedes that the anonymous tip received by the Ranson Police Department was sufficiently reliable to justify the officers' reliance on it. See Navarette, 134 S. Ct. at 1688-89 (concluding that an anonymous 911 call "bore adequate indicia of reliability for the officer to credit the caller's account" in large part because, like here, the caller "claimed eyewitness knowledge of the alleged [conduct]" and the call was a "contemporaneous report" that was "made under the stress of excitement caused by a startling event"). Finally, and most importantly, Robinson does not contest the district court's conclusion that the police had reasonable suspicion to believe that he was armed.

Robinson's argument focuses on whether the officers could reasonably have suspected that he was dangerous. He argues that while the officers may well have had good reason to suspect that he was carrying a loaded concealed firearm, they lacked

objective facts indicating that he was also dangerous, so as to justify a frisk for weapons, since an officer must reasonably suspect that the person being frisked is both armed and dangerous. See Terry, 392 U.S. at 27. Robinson notes that at the time of the frisk, West Virginia residents could lawfully carry a concealed firearm if they had received a license from the State. See W. Va. Code § 61-7-3 to -4 (2014). And, because the police did not know whether or not he possessed such a license, the tip that a suspect matching his description was carrying a loaded firearm concealed in his pocket was, he argues, a report of innocent behavior that was not sufficient to indicate that he posed a danger to others. Moreover, he argues, his behavior during the stop did not create suspicion -- "he was compliant, cooperative, [and] not displaying signs of nervousness." In these circumstances, he concludes, the officer's frisk was not justified by any reasonable suspicion that he was dangerous.

Robinson's argument presumes that the legal possession of a firearm cannot pose a danger to police officers during a forced stop, and it collapses the requirements for making a stop with the requirements for conducting a frisk. It thus fails at several levels when considered under the Supreme Court's "stop-and-frisk" jurisprudence. First, Robinson confuses the standard for making stops -- which requires a reasonable suspicion that a

10

crime or other infraction has been or is being committed -- with the standard for conducting a frisk -- which requires both a lawful investigatory stop and a reasonable suspicion that the person stopped is armed and dangerous. See Arizona v. Johnson, 555 U.S. 323, 326-27 (2009). Second, he fails to recognize that traffic stops alone are inherently dangerous for police officers. Third, he also fails to recognize that traffic stops of persons who are armed, whether legally or illegally, pose yet a greater safety risk to police officers. And fourth, he argues illogically that when a person forcefully stopped may be legally permitted to possess a firearm, any risk of danger to police officers posed by the firearm is eliminated.

We begin by noting that the Supreme Court has repeatedly recognized that whenever police officers use their authority to effect a stop, they subject themselves to a risk of harm. This holds true whether the temporary detention is a traditional, "on-the-street" Terry stop to investigate an officer's reasonable suspicion "that the person apprehended is committing or has committed a criminal offense," Johnson, 555 U.S. at 326, or a stop of a motor vehicle and all of its occupants to enforce a jurisdiction's traffic laws, id. at 327. The Supreme Court has explained that "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact

11

that evidence of a more serious crime might be uncovered during the stop.'" Id. at 331 (quoting Wilson, 519 U.S. at 414); see also Mimms, 434 U.S. at 110 (rejecting "the argument that traffic violations necessarily involve less danger to officers than other types of confrontations"). Indeed, the Court has concluded that traffic stops are "especially fraught with danger to police officers." Long, 463 U.S. at 1047. And the Court has also observed that when the stop involves one or more passengers, that fact "increases the possible sources of harm to the officer," Wilson, 519 U.S. at 413, as "the motivation of a passenger to employ violence . . . is every bit as great as that of the driver," id. at 414.

In Wilson, the Court observed that "[i]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops," 519 U.S. at 413, prompting the Court to conclude that the public interest in police officer safety during traffic stops is "both legitimate and weighty," id. at 412 (quoting Mimms, 434 U.S. at 110). And more recent statistics, unfortunately, remain as grim. Of the 51 law enforcement officers feloniously killed in the line of duty in 2014, 9 officers (or 18%) were fatally injured during traffic pursuits or stops. FBI, Officers Feloniously Killed, in Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted, 2014.

12

To be clear, the general risk that is inherent during a traffic stop does not, without more, justify a frisk of the automobile's occupants. But the risk inherent in all traffic stops is heightened exponentially when the person who has been stopped -- a person whose propensities are unknown -- is "armed with a weapon that could unexpectedly and fatally be used against" the officer in a matter of seconds. Terry, 392 U.S. at 23. As such, when the officer reasonably suspects that the person he has stopped is armed, the officer is "warranted in the belief that his safety . . . [is] in danger," id. at 27, thus justifying a Terry frisk.

In Terry, Officer McFadden "seized" Terry on the street and subjected him to a "search" without probable cause to believe that he had committed or was committing a crime or that he was armed. 392 U.S. at 19. The Court was thus confronted with two distinct constitutional issues: first, whether a person could be stopped (seized) on suspicion of criminal conduct that fell short of probable cause; and second, whether the officer could conduct a protective frisk or "pat down" for weapons (search) during the stop. The Court readily concluded that Terry's seizure was "reasonable" under the Fourth Amendment because the officer reasonably believed that criminal conduct was afoot. Id. at 22-23. The Court then turned its attention to the legality of the frisk, stating, "We are now concerned with more

13

than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Id. at 23. The concern -- i.e., the danger -- was thus found in the presence of a weapon during a forced police encounter. Indeed, the Court said as much, noting in approving Officer McFadden's frisk of Terry that "a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer's safety." Id. at 28 (emphasis added). In this manner, the Court adopted the now well-known standard that an officer can frisk a validly stopped person if the officer reasonably believes that the person is "armed and dangerous." Id. at 27; see also id. at 32 (Harlan, J., concurring) (explaining that because a "frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop").

The Supreme Court applied Terry to circumstances analogous to those before us in Mimms, where an officer, after making a routine traffic stop, "noticed a large bulge" under the defendant's jacket and therefore conducted a frisk. 434 U.S. at 107. Holding that the frisk was clearly justified, the Mimms

14

Court explained that "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed <u>and thus posed a serious and present danger to the safety of the officer</u>," adding that "[i]n these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'" <u>Id.</u> at 112 (emphasis added). The only evidence of Mimms' dangerousness was the bulge indicating that he was armed. <u>See</u> <u>id</u>. It was thus Mimms' status of being armed during a forced police encounter (the traffic stop) that posed the danger justifying the frisk, and we have previously relied on <u>Mimms</u> for that precise principle. <u>See</u> <u>United States v. Baker</u>, 78 F.3d 135, 137 (4th Cir. 1996) (citing <u>Mimms</u>, 434 U.S. at 112) ("Based on the inordinate risk of danger to law enforcement officers during traffic stops, observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation").

In short, established Supreme Court law imposes two requirements for conducting a frisk, but no more than two: <u>first</u>, that the officer have conducted a lawful stop, which includes both a traditional <u>Terry</u> stop as well as a traffic stop; and <u>second</u>, that during the valid but forced encounter, the officer reasonably suspect that the person is <u>armed and therefore dangerous</u>. In both <u>Terry</u> and <u>Mimms</u>, the Court

15

deliberately linked "armed" and "dangerous," recognizing that the frisks in those cases were lawful because the stops were valid and the officer reasonably believed that the person stopped "was armed and thus" dangerous. Terry, 392 U.S. at 28 (emphasis added); Mimms, 434 U.S. at 112 (emphasis added). The use of "and thus" recognizes that the risk of danger is created simply because the person, who was forcibly stopped, is armed.

In this case, both requirements -- a lawful stop and a reasonable suspicion that Robinson was armed -- were satisfied, thus justifying Captain Roberts' frisk under the Fourth Amendment as a matter of law.

Robinson argues that Mimms is distinguishable because the frisk there took place in a jurisdiction that made it a crime to carry a concealed deadly weapon. West Virginia, on the other hand, generally permits its citizens to carry firearms. From this distinction, Robinson argues that when the person forcibly stopped may be legally permitted to possess a firearm, the risk of danger posed by the firearm is eliminated. This argument, however, fails under the Supreme Court's express recognition that the legality of the frisk does not depend on the illegality of the firearm's possession. Indeed, the Court has twice explained that "[t]he purpose of this limited search [i.e., the frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence,

16

and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." Williams, 407 U.S. at 146 (emphasis added); see also Long, 463 U.S. at 1052 n.16 ("[W]e have expressly rejected the view that the validity of a Terry search [i.e., a frisk] depends on whether the weapon is possessed in accordance with state law"). Robinson's position directly conflicts with these observations.

Notwithstanding the Supreme Court's statements, Robinson's position also fails as a matter of logic to recognize that the risk inherent in a forced stop of a person who is armed exists even when the firearm is legally possessed. The presumptive lawfulness of an individual's gun possession in a particular State does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown. See United States v. Rodriguez, 739 F.3d 481, 491 (10th Cir. 2013) (concluding that "an officer making a lawful investigatory stop [must have] the ability to protect himself from an armed suspect whose propensities are unknown" and therefore rejecting the defendant's argument that the officer "had no reason to believe he was dangerous" even though the officer had seen a handgun tucked into the waistband of his pants).

17

Accordingly, we conclude that given Robinson's concession that he was lawfully stopped and that the police officers had reasonable suspicion to believe that he was armed, the officers were, as a matter of law, justified in frisking him and, in doing so, did not violate Robinson's Fourth Amendment rights.

## III

While the lawful traffic stop of Robinson and the reasonable suspicion that he was armed justified the frisk in this case, the officers had knowledge of additional facts that increased the level of their suspicion that Robinson was dangerous.

First, the reliable tip in this case was not just that an individual matching Robinson's description possessed a firearm. Rather, the caller reported that he had observed an individual "load a firearm [and] conceal it in his pocket" while in the parking lot of the 7-Eleven on North Mildred Street, a location that the officers knew to be a popular spot for drug-trafficking activity. Four officers testified about the high level of drug-trafficking and other criminal activity in that particular parking lot, prompting one to explain, "[a]nytime you hear . . . 7-Eleven, your radar goes up a notch." Knowing that the 7-Eleven parking lot was frequently used as a site for drug trafficking, a reasonable officer could legitimately suspect

that an individual who was seen both loading and concealing a firearm in that very parking lot may well have been doing so in connection with drug-trafficking activity, making his possession of a firearm even more dangerous. See United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing the "numerous ways in which a firearm might further or advance drug trafficking").

Second, when Captain Roberts asked Robinson, as he was getting out of the car, whether he was carrying any firearms, Robinson failed to respond verbally and instead gave the officer an "'oh, crap' look[]," which Roberts took to mean, "I don't want to lie to you, but I'm not going to tell you anything [either]." Surely, Robinson's evasive response further heightened Captain Roberts' legitimate concern as to the dangerousness of the situation.

While not necessary to the conclusion in this case, these facts can only confirm Captain Roberts' reasonable suspicion that Robinson was dangerous and therefore should be frisked for the protection of the officer and all others present. Indeed, in light of all of the circumstances known to Captain Roberts, he would unquestionably have been criticized for not conducting a frisk if, after having failed to do so, something untoward had happened.

19

\*     \*     \*

The judgment of the district court is accordingly

AFFIRMED.

WYNN, Circuit Judge, concurring in the judgment:

Defendant Shaquille Robinson concedes that law enforcement officers reasonably suspected that he was carrying a firearm.[1] Defendant further concedes that the law enforcement officers lawfully stopped him for an unrelated, albeit pretextual, reason. I agree with the majority that these facts alone allowed the officers to perform a protective frisk of Defendant during the stop.

In reaching this conclusion, the majority frames this case as a run-of-the-mill search-and-seizure case involving a traffic stop in which we must assess whether law enforcement officers had reasonable suspicion to frisk Defendant based on the facts known to the officers at the time they conducted the frisk. To that end, the majority focuses on the dangers law enforcement officers face in conducting lawful stops, particularly traffic stops, and the officers' reasonable suspicion that Defendant had a "weapon."

---

[1] The majority states that the law enforcement officers received a "tip" that Defendant was carrying a loaded firearm. <u>Ante</u> at 4.

Carrying a loaded firearm in West Virginia is presumptively lawful activity. Thus, information that an individual is engaging in presumptively lawful activity should not constitute a "tip" for purposes of this analysis.

But this case is not about traffic stops or "weapons"--it is about firearms and the danger they pose to law enforcement officers. In particular, this case arises from the Defendant's presumptively lawful activity of carrying a firearm, which became the basis for making a pretextual, albeit lawful, stop for not wearing a seatbelt. From these remarkable facts, the majority opinion reduces the issue in this case to whether the officers justifiably frisked Defendant, after a lawful stop, because they had a "tip" that Defendant carried a "weapon."

By focusing on the officers' justification--rather than Defendant's presumptively lawful decision to carry a firearm-- the majority elides discussion of the two key issues in this case: (1) whether individuals who carry firearms--lawfully or unlawfully--pose a categorical risk of danger to others and police officers, in particular, and (2) whether individuals who choose to carry firearms forego certain constitutional protections afforded to individuals who elect not to carry firearms. As explained in more detail below, the majority opinion's attempt to duck these questions is futile because its conclusion necessarily answers "yes" to both questions.

I.

First, the majority opinion altogether avoids addressing the first issue--whether individuals who carry firearms (lawfully or unlawfully) pose a categorical risk of danger to

22

others--by reinterpreting the Supreme Court's long-established test for determining whether law enforcement officers lawfully performed a protective frisk. Under that test, the question is whether the officers had "reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 327 (1997). Instead of according "dangerous" an independent meaning, the majority contends that "armed and dangerous" is a unitary concept--if law enforcement officers reasonably suspect a detainee is "armed," they necessarily reasonably suspect he is "dangerous." Ante at 16 ("[T]he risk of the danger is created simply because the person, who was forcibly stopped, is armed."). I disagree with the majority opinion's contention that "armed and dangerous" is a unitary concept.

To be sure, from the outset, stripping "dangerous" of independent meaning violates the long-standing principle that elements separated by a conjunctive should be interpreted as distinct requirements. See, e.g., Crooks v. Harrelson, 282 U.S. 55, 58 (1932); Am. Paper Inst. v. U.S. E.P.A., 660 F.2d 954, 961 (4th Cir. 1981). That is why other Circuits have held that law enforcement officers must reasonably suspect a detainee is "both armed and a danger to the safety of officers or others" before conducting a frisk. United States v. Leo, 792 F.3d 742, 748 (7th Cir. 2015) (emphasis added); Northrup v. City of Toledo Police

23

Dep't, 785 F.3d 1128, 1132 (6th Cir. 2015) ("Clearly established law required [the officer] to point to evidence that [the subject] may have been armed and dangerous. Yet all he ever saw was that [the subject] was armed--and legally so." (emphasis in original) (citation and internal quotation marks omitted)).

The view of the other Circuits on according "dangerous" an independent meaning makes sense because the majority opinion's unitary meaning interpretation would allow law enforcement officers to frisk a wide swath of lawfully stopped individuals engaging in harmless activity. Indeed, by definition, an individual is "armed" if he is "[e]quipped with a weapon." Armed, Black's Law Dictionary (9th ed. 2009).

To illustrate the absurdity of the majority opinion's unitary meaning interpretation, consider, for example, that courts have found a bottle to be a "weapon." See United States v. Daulton, 488 F.2d 524, 525 (5th Cir. 1973) ("Courts have held that a wine bottle can be a dangerous weapon."). Under the majority's unitary meaning interpretation, officers informed that an individual was leaving a convenience store "armed" with a bottle of wine could, after a lawful stop, frisk that individual because, in the majority's words, "the risk of the danger is created simply because the person, who was forcibly stopped, is armed." Ante at 16.

24

As Justice Brennan noted, numerous everyday objects turn into "weapons" when put to appropriate use:

> A "weapon" could include a brick, a baseball bat, a hammer, a broken bottle, a fishing knife, barbed wire, a knitting needle, a sharpened pencil, a riding crop, a jagged can, rope, a screw driver, an ice pick, a tire iron, garden shears, a pitch fork, a shovel, a length of chain, a penknife, a fork, metal pipe, a stick, etc. The foregoing only illustrate the variety of lawful objects which are often innocently possessed without wrongful intent.

Wright v. New Jersey, 469 U.S. 1146, 1149 n.3 (1985) (Brennan, J., dissenting from dismissal for want of substantial federal question). Under the majority opinion's unitary meaning interpretation, reasonable suspicion that an individual possessed any of these items would give rise to reasonable suspicion to frisk the individual, after a lawful stop, even absent any evidence the individual intended to use the object as a weapon. The Fourth Amendment does not contemplate giving law enforcement officers such wide-ranging authority to engage in warrantless frisks of detainees. See, e.g., City of Los Angeles v. Patel, 135 S. Ct. 2443, 2455 (2015) (holding that courts must not interpret the Fourth Amendment in a way that allows the "narrow exception[s]" to the warrant requirement "to swallow the rule"); United States v. Wilson, 953 F.2d 116, 126 (4th Cir. 1991) (refusing to allow "limited Terry exception to swallow the rule").

The majority nonetheless contends that the Supreme Court "deliberately linked 'armed' and 'dangerous'" in Terry v. Ohio, 392 U.S. 1 (1968), and Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam), by approving frisks because the officers "reasonably believed that the person stopped 'was armed and thus' dangerous." Ante at 16 (quoting Terry, 392 U.S. at 28; Mimms, 434 U.S. at 112). But when the Supreme Court has elaborated on the test for a lawful frisk, it has highlighted the independent role of "dangerousness," holding that Terry authorizes a "frisk" of an automobile when law enforcement officers reasonably suspect "that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983).

How then do we reconcile the language in Terry and Mimms, upon which the majority relies, with Long and the plain language of the test, which requires that officers reasonably suspect an individual is both armed and dangerous? The answer plainly lies in the type of "weapon" at issue.

In Long, the officers reasonably suspected that the defendant had a knife. 463 U.S. at 1050. By contrast, in Terry and Mimms, the officers reasonably suspected the detainees had firearms. Terry, 392 U.S. at 6-7; Mimms, 434 U.S. at 106. Accordingly, Terry and Mimms collapse the "armed and dangerous" test into a single inquiry only when law enforcement officers

26

reasonably suspect that a detainee has a <u>firearm</u> or other inherently dangerous weapon. Such a reading ensures that the "armed" and "dangerous" prongs retain distinct meaning and places meaningful restrictions on law enforcement officers' ability to frisk lawfully stopped individuals.

But the majority opinion also contends that we should collapse the "armed and dangerous" test into a single inquiry-- regardless of the type of "weapon" with which the detainee is "armed"-- because the combination of a "forcible stop" and an armed detainee poses a "risk of danger." <u>Ante</u> at 16 ("[T]he risk of danger is created simply because the person, who was forcibly stopped, is armed."). Yet committing a minor traffic violation--a seatbelt violation here--provides no basis to believe an individual poses any special danger warranting departure from the rule that law enforcement officers may not, as a general matter, frisk lawfully detained individuals. Likewise, as explained above, given the numerous objects that can constitute "weapons," being "armed" does not, by itself, establish that an individual poses a danger. Rather, what the majority opinion skillfully avoids is that the "risk of danger" to the officers arose from the officers' reasonable suspicion Defendant was carrying a <u>firearm</u>.

Confronting the inescapable reality that lawfully-stopped individuals armed with firearms are categorically dangerous

27

reflects the heightened danger posed by firearms. To that end, the Supreme Court has held that "a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous." McLaughlin v. United States, 476 U.S. 16, 17 (1986). This Court also has recognized "the substantial risk of danger and the inherently violent nature of firearms," Pelissero v. Thompson, 170 F.3d 442, 447 (4th Cir. 1999) (quotation omitted), as have other Circuits, e.g., United States v. Copening, 506 F.3d 1241, 1248 (10th Cir. 2007) (characterizing a "loaded gun [as] by any measure an inherently dangerous weapon"); Love v. Tippy, 133 F.3d 1066, 1069 (8th Cir. 1998) (recognizing "the inherently violent nature of firearms, and the danger firearms pose to all members of society"); United States v. Allah, 130 F.3d 33, 40 (2d Cir. 1997) ("[F]irearms are inherently dangerous devices.").

Indeed, the Supreme Court's decision in District of Columbia v. Heller--which first recognized the individual right to carry firearms--is premised on the dangerousness of carrying firearms. In particular, Heller held that the Second Amendment affords individuals the right to keep and use handguns for the "defense" and "protection of one's home and family"--for example, to ward off "attacker[s]" or threaten "burglar[s]." 554

28

U.S. 570, 628-29 (2008) (emphasis added). If a lawfully possessed firearm did not pose a danger to attackers, burglars, or other threatening individuals, there would be no need for individuals to own and carry firearms for protection.

And the widespread judicial recognition of the inherent dangerousness of firearms accords with the evidence. The Department of Justice reported that in 2011, the most recent year for which comprehensive statistics are available, a total of 478,400 fatal and nonfatal violent crimes were committed with afirearm. Michael Planty & Jennifer L. Truman, U.S. Dep't of Justice, Bureau of Justice Stats., Special Report: Firearm Violence, 1993-2011, at 1 (May 2013). Likewise, firearms are a leading cause of injury-related death in the United States and have been for many years. Jonathan E. Selkowitz, Comment, Guns, Public Nuisance, and the PLCAA: A Public Health-Inspired Legal Analysis of the Predicate Exception, 83 Temp. L. Rev. 793, 801-02 (2011); see also Centers for Disease Control & Prevention, Nat'l Ctr. for Health Stats., Underlying Cause of Death 1999-2014 on CDC WONDER Online Database, http://wonder.cdc.gov/ucd-icd10.html (queried on Nov. 18, 2016) (reporting that there were 497,632 intentional firearms deaths between 1999 and 2014). Accordingly, as a matter of law and fact, firearms--and therefore individuals who choose to carry firearms--are inherently dangerous.

In sum, individuals who carry firearms--lawfully or unlawfully--pose a risk of danger to themselves, law enforcement officers, and the public at large. Accordingly, law enforcement officers may frisk lawfully stopped individuals whom the officers reasonably suspect are carrying a firearm because a detainee's possession of a firearm poses a categorical "danger" to the officers.

## II.

Having determined that individuals who are armed with a firearm are categorically "dangerous," we confront the second issue--whether individuals who choose to carry firearms sacrifice certain constitutional protections afforded to individuals who elect not to carry firearms. We must confront this issue because treating individuals armed with firearms--lawfully or unlawfully--as categorically dangerous places special burdens on such individuals. Today we recognize one such burden: individuals who carry firearms elect to subject themselves to being frisked when lawfully stopped by law enforcement officers.

I see no basis--nor does the majority opinion provide any-- for limiting our conclusion that individuals who choose to carry firearms are categorically dangerous to the Terry frisk inquiry. Accordingly, the majority decision today necessarily leads to the conclusion that individuals who elect to carry firearms

30

forego other constitutional rights, like the Fourth Amendment right to have law enforcement officers "knock-and-announce" before forcibly entering homes. See Richards v. Wisconsin, 520 U.S. 385, 394 (1997) ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile." (emphasis added)). Likewise, it is difficult to escape the conclusion that individuals who choose to carry firearms necessarily face greater restriction on their concurrent exercise of other constitutional rights, like those protected by the First Amendment. See Schenck v. United States, 249 U.S. 47, 52 (1919) (Holmes, J.) ("The question in every [freedom of speech] case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." (emphasis added)).

The Supreme Court has long recognized that "[t]he promotion of safety of persons and property is unquestionably at the core of the State's police power," Kelley v. Johnson, 425 U.S. 238, 247 (1976), and "the structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons," Gonzales v. Oregon, 546 U.S.

31

243, 270 (2006). Thus, like most rights, the right protected by the Second Amendment--which Defendant's conduct may or may not implicate[2]--"is not unlimited" and therefore does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626. In particular, today's majority opinion necessarily recognizes that the limitations on the right to carry firearms derive not only from the language of the Second Amendment--as Heller recognized--but also from other provisions in the Constitution, which protect law enforcement officers and the public at large from individuals who elect to engage in dangerous activities, like the carrying of firearms.

---

[2] Although we have expressly declined to resolve whether the right recognized in Heller extends beyond the home, United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011), other courts are divided on the question, compare Moore v. Madigan, 702 F.3d 933, 936 (7th Cir. 2012) (recognizing that the "right to keep and bear arms for personal self-defense . . . implies a right to carry a loaded gun outside the home"); Palmer v. Dist. of Columbia, 59 F. Supp. 3d 173, 181-82 (D.D.C. 2014) (holding that Second Amendment right recognized in Heller extends beyond home), with Peruta v. Cnty. of San Diego, 824 F.3d 919, 940 (9th Cir. 2016) ("[T]he Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public." (emphasis added)); Young v. Hawaii, 911 F. Supp. 2d, 972, 990 (D. Haw. 2012) ("[L]imitations on carrying weapons in public do[] not implicate activity protected by the Second Amendment."); Williams v. State, 10 A.3d 1167, 1178 (Md. 2011) (holding that regulations on carrying firearms outside the home are "outside of the scope of the Second Amendment, as articulated in Heller and McDonald").

III.

In sum, because the carrying of a firearm poses a categorical danger to others--in this case, law enforcement officers--the law enforcement officers lawfully frisked Defendant, after lawfully detaining him, based on information that he carried a firearm. Accordingly, I concur in the majority opinion's decision to affirm Defendant's convictions.

PAMELA HARRIS, Circuit Judge, with whom GREGORY, Chief Judge, DIANA GRIBBON MOTZ, Circuit Judge, and DAVIS, Senior Circuit Judge, join, dissenting:

In many jurisdictions and for many years, police officers could assume that anyone carrying a concealed firearm was up to no good. Because public possession of guns was prohibited or tightly regulated, concealed firearms were hallmarks of criminal activity, deadly weapons carried by law-breakers to facilitate their crimes. So it followed, without much need for elaboration, that if a suspect legally stopped by the police was carrying a gun, then he was not only "armed" but also "dangerous," justifying a protective frisk under Terry v. Ohio, 392 U.S. 1 (1968).

But that is no longer the case, at least in states like West Virginia. Today in West Virginia, citizens are legally entitled to arm themselves in public, and there is no reason to think that a person carrying or concealing a weapon during a traffic stop – conduct fully sanctioned by state law – is anything but a law-abiding citizen who poses no threat to the authorities. And as behavior once the province of law-breakers becomes commonplace and a matter of legal right, we no longer may take for granted the same correlation between "armed" and "dangerous."

The majority disagrees, adopting a bright-line rule that any citizen availing him or herself of the legal right to carry

34

arms in public is per se "dangerous" under the Terry formulation and therefore subject to frisk and disarmament, at police discretion, if stopped for a traffic violation or some other minor infraction. It may be, as the concurring opinion suggests, that this is where we will end up – that the price for exercising the right to bear arms will be the forfeiture of certain Fourth Amendment protections. Conc. Op. at 30-31. But unless and until the Supreme Court takes us there, I cannot endorse a rule that puts us on a collision course with rights to gun possession rooted in the Second Amendment and conferred by state legislatures. Nor would I adopt a rule that leaves to unbridled police discretion the decision as to which legally armed citizens will be targeted for frisks, opening the door to the very abuses the Fourth Amendment is designed to prevent. I must respectfully dissent.

## I.

"[A]s public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt." United States v. Williams, 731 F.3d 678, 691 (7th Cir. 2013) (Hamilton, J., concurring). Within the last decade, federal constitutional law has recognized new Second Amendment protections for individual possession of firearms, see McDonald v. City of Chicago, 561

35

U.S. 742, 791 (2010); District of Columbia v. Heller, 554 U.S. 570, 635 (2008), and state law has followed, providing expanded rights to carry guns in public, see Williams, 731 F.3d at 691. That states have elected to trust their citizens to carry guns safely cannot, of course, change federal Fourth Amendment law. But it does change the facts on the ground to which Fourth Amendment standards apply. And once it no longer is the case that the public carry of guns is illegal or even unusual, courts must take into account that changed circumstance in applying the familiar Terry standard.

We have recognized as much already when it comes to the "stop" portion of a Terry "stop and frisk," justified on reasonable suspicion of criminal activity. See Terry, 392 U.S. at 30; Arizona v. Johnson, 555 U.S. 323, 326-27 (2009). In jurisdictions in which the public carry of firearms is prohibited or closely regulated, a concealed gun is indicative of criminal activity and may give rise to "reasonable suspicion" sufficient to justify an investigative stop. But when a state elects to legalize the public carry of firearms, we have held, the Fourth Amendment equation changes, and public possession of a gun is no longer "suspicious" in a way that would authorize a Terry stop. United States v. Black, 707 F.3d 531, 539-40 (4th Cir. 2013). "Permitting such a justification" for a Terry stop,

36

we explained, "would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." Id. at 540.

We are not alone in this insight. In Northrup v. City of Toledo Police Dep't, 785 F.3d 1128, 1131-33 (6th Cir. 2015), for instance, the Sixth Circuit held that where state law permits the open carry of firearms, the police are not authorized by Terry to conduct a stop – or an attendant frisk – of a person brandishing a gun in public. Where the state legislature "has decided its citizens may be entrusted with firearms on public streets," the court reasoned, the police have "no authority to disregard this decision" by subjecting law-abiding citizens to Terry stops and frisks. Id. at 1133; see also, e.g., United States v. Leo, 792 F.3d 742, 749-50, 751-52 (7th Cir. 2015) (rejecting "frisk" and search of backpack on suspicion that it contains gun in light of "important developments in Second Amendment law together with Wisconsin's [concealed-carry] gun laws"); United States v. Ubiles, 224 F.3d 213, 218 (3d Cir. 2000) (invalidating Terry stop based on suspicion of gun possession in open-carry jurisdiction).

In my view, the same reasoning compels the conclusion that in a state like West Virginia, which broadly allows public possession of firearms, reasonable suspicion that a person is armed does not by itself give rise to reasonable suspicion that the person also is dangerous, so as to justify a Terry frisk.

37

Guns, of course, are in some sense intrinsically dangerous. But the question under Terry is whether a person carrying a gun is a danger to the police or others. Terry, 392 U.S. at 24. And where the state legislature has decided that its citizens may be entrusted to safely carry firearms on public streets and during traffic stops, and law-abiding citizens have availed themselves of these rights, I do not see how we can presume that every one of those citizens necessarily poses a danger to the police. See Northrup, 785 F.3d at 1133 (absent reasonable suspicion that an armed man is dangerous, officers must "trust . . . their State's approach to gun licensure and gun possession").

To be clear: As Officer Tharp testified at the suppression hearing, none of the conduct reported in the anonymous tip she received – that an African-American man had loaded a gun in the parking lot of a 7-Eleven and then concealed it in his pocket before leaving in a car – was illegal under West Virginia law. Nor was there any testimony from the officers that the reported conduct was unusual, or "out of place" where it occurred. Cf. United States v. Arvizu, 534 U.S. 266, 276 (2002) (conduct that appears innocuous in one setting but is unusual in another may give rise to reasonable suspicion).[1] In terms of Robinson's

---

[1] We have held that in jurisdictions generally allowing public gun possession, police testimony that few law-abiding citizens take advantage of that right is not enough to establish

behavior, the officers knew nothing except that Robinson was engaging in what we must treat as a presumptively lawful exercise of his right to carry a concealed weapon. See Black, 707 F.3d at 540 (police may not proceed on assumption that gun displayed in open-carry jurisdiction may be illegally possessed by convicted felon); see also Northrup, 785 F.3d at 1132 (same). If that by itself is enough to make a person "dangerous" for Terry purposes, then the legal right to carry arms in public is perfectly self-defeating: The moment a person exercises that right – and has the misfortune to be stopped for a traffic violation or other minor infraction – he opens himself up to being frisked and disarmed, at least temporarily, by law enforcement officers.

The majority insists that this result, putting at cross-purposes Fourth Amendment and gun possession rights, is compelled by the Supreme Court's holdings in Terry v. Ohio, 392 U.S. at 27, and Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) (per curiam). According to the majority, those cases establish that if the police have reasonable suspicion that a suspect is "armed," then they necessarily have reasonable suspicion that he

reasonable suspicion for a Terry stop when a gun is publicly displayed. See Black, 707 F.3d at 540. But even assuming that such testimony might bear on the separate "dangerousness" inquiry under Terry, none was offered at this suppression hearing.

39

is "dangerous," as well, justifying a frisk under Terry's "armed and dangerous" standard.  In other words, when the Supreme Court says "armed and dangerous," what it really means is "armed and therefore dangerous," Maj. Op. at 13-16 – or, put more simply, "armed."

But the Supreme Court for decades has adhered to its conjunctive "armed and dangerous" formulation, giving no indication that "dangerous" may be read out of the equation as an expendable redundancy.  See Michigan v. Long, 463 U.S. 1032, 1049 (1983) (approving Terry "frisk" of automobile on reasonable suspicion "that the suspect is dangerous and the suspect may gain immediate control of weapons") (emphasis added).  Indeed, until its latest filing before our en banc court, the government itself understood "armed" and "dangerous" as separate and independent conditions of a lawful Terry frisk.  See Gov't Br. at 16-17.  And other courts applying Terry in precisely this context – against a backdrop of state laws that routinely permit the public possession of firearms – have taken the same position, holding that a Terry frisk requires reasonable suspicion that a person is "both armed and a danger to the safety of officers or others."  Leo, 792 F.3d at 748; see Northrup, 785 F.3d at 1132 ("Clearly established law required [the officer] to point to evidence that [the suspect] may have been armed and dangerous.  Yet all he ever saw was that [the

40

suspect] was armed – and legally so.") (emphasis in original) (citation omitted).

It is true, as the majority argues, that the Court in Terry and Mimms was prepared to infer danger from the presence of a concealed firearm. Terry, 392 U.S. at 28; Mimms, 434 U.S. at 112. But that simply brings us back to our starting point: that in jurisdictions where public possession or concealed carry of guns is illegal, as in Terry, see Northrup, 785 F.3d at 1131, or tightly regulated, as in Mimms,[2] there is precious little space between "armed" and "dangerous" – not only because someone carrying a gun probably is breaking the law already, but also because he likely is inclined to commit other crimes with the assistance of the gun. Nobody – including Robinson – doubts that as in Mimms and Terry, a presumptively illegal concealed gun gives rise to a reasonable suspicion of dangerousness, allowing the police to conduct a protective frisk. But those cases simply do not speak to the very different circumstances presented when public gun possession is presumptively legal, see Black, 707 F.3d at 540, and there no longer is reason to believe

_____

[2] At the time of the events in Mimms, local law appears to have strictly limited the public possession of firearms, allowing it only in certain narrow circumstances. See 1943 Pa. Laws 487; 1972 Pa. Laws 1577.

41

that a person carrying a gun during a traffic stop is anything but a perfectly law-abiding citizen.

Nor, contrary to the majority's analysis, Maj. Op. at 16-17, does Adams v. Williams, 407 U.S. 143 (1972), resolve this issue. Adams does make clear, as the majority emphasizes, that even a lawfully possessed firearm can pose a threat to officer safety. 407 U.S. at 146. But that point is of limited use here, because nobody is disputing it. Robinson's argument is not, as the majority would have it, Maj. Op. at 16, that any risk of danger posed by a firearm necessarily is "eliminated" if the firearm is legally possessed. Where, as in Adams, an armed man suspected of drug offenses is sitting alone in a parked car at 2:15 a.m. and unwilling to cooperate with the police, everyone agrees that the circumstances give rise to a reasonable suspicion of "dangerousness" regardless of the legal status of the gun. See 407 U.S. at 147-48. But the question in this case is different: not whether a presumptively lawful gun may give rise to a reasonable suspicion of dangerousness under certain circumstances, but whether it necessarily and automatically does so in every circumstance. On that question, Adams has nothing to say.[3]

---

[3] Nor does Michigan v. Long, 463 U.S. 1032 (1983), on which the majority also relies. In a footnote, Long cites Adams for the proposition that a person in legal possession of a weapon –

42

The problems with treating "armed and dangerous" as a "unitary" concept, see Conc. Op. at 23, go beyond the mismatch with precedent.  As the concurring opinion cogently explains, the logic of Terry frisk doctrine is premised on an independent role for dangerousness:  Whether a person in possession of, say, a screwdriver is deemed "armed" under Terry depends entirely on whether there is separate reason to believe he or she also is "dangerous" and thus might use that screwdriver as a weapon.  See Conc. Op. at 24-25; United States v. Matchett, 802 F.3d 1185, 1193 (11th Cir. 2015) (upholding Terry frisk of burglary suspect because burglars frequently are "armed" with tools like screwdrivers).

And though it purports to rely on a common-sense equation of guns with danger, the majority's approach can embrace that connection only very selectively:  An armed citizen in an open-carry jurisdiction necessarily poses a "danger" to the police

---

in Long, a knife – may pose a risk of danger to the police.  Id. at 1052 n.16.  But the Court's approval of the frisk in Long rested not only on the presence of a weapon, but also on an independent finding that under all the circumstances of the case – featuring a suspect who drove at excessive speed, swerved into a ditch, refused initially to cooperate, and appeared to be intoxicated – the officers were "clearly justified" in their "reasonable belief that Long posed a danger" to their safety. Id. at 1050.

43

that justifies a protective frisk if and only if he appears to have committed some offense, however trivial – like the seatbelt violation here – leading to a valid stop. See Maj. Op. at 15-16. If, on the other hand, the police in this case had initiated a consensual encounter with Robinson in the 7-Eleven parking lot, then the gun Robinson was suspected of carrying would not have been grounds for a frisk, as the government conceded at oral argument. Likewise, had Robinson exited the car in which he was a passenger before the police could conduct their pretextual traffic stop, then again he would no longer be "dangerous" for purposes of allowing a Terry frisk, notwithstanding the concealed gun in his pocket. To be sure, as the majority explains, Maj. Op. at 15, Terry doctrine requires that a frisk be attendant to a lawful stop. But if "armed" may be conflated with "dangerous" under Terry, then it is hard to see why an officer's right to protect him or herself would be made to turn on whether a dangerous person carrying a gun has remembered to fasten his seatbelt.

Most important, by equating "armed" with "dangerous" even in states where the carrying of guns is widely permitted, the majority's rule has the effect of depriving countless law-abiding citizens of what otherwise would be their Fourth Amendment and other constitutional rights. As the concurring opinion explains, the upshot of the majority's approach is that

44

citizens who avail themselves of their legal right to carry firearms will be subject to a wide range of "special burdens," the full extent of which we only can begin to discern. Conc. Op. at 30. Certainly, such citizens may be frisked and temporarily disarmed when stopped, even for the most minor of infractions; if they necessarily are "dangerous," then the police should be free to dispense with Fourth Amendment "knock-and-announce" protections before entering their homes; and when armed and "therefore dangerous" citizens seek to assemble in public, their First Amendment rights may be restricted based on the risk they are conclusively presumed to pose to public safety. See id. at 30-31. To the concurring opinion's list, I would add one more: If a police officer reasonably believes that a suspect poses a "threat of serious physical harm," he may use deadly force to protect himself, see, e.g., Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013) (internal quotation marks omitted), and while we have held in the past that the presence of a gun alone does not constitute a "threat," id., or establish that a suspect is "dangerous" to an officer, Pena v. Porter, 316 F. App'x 303, 311 (4th Cir. 2009) (unpublished), today's decision insisting on a conclusive link between "armed" and "dangerous" undoubtedly will have implications for police use of force, as well. Those consequences – and others that surely will follow – are profound, both practically and

45

constitutionally, and I would not be so quick to invite them without some direction from the Supreme Court.

But my biggest concern is that these "special burdens" – most relevantly, the Terry frisks at issue here – will not be distributed evenly across the population. Allowing police officers making stops to frisk anyone thought to be armed, in a state where the carrying of guns is widely permitted, "creates a serious and recurring threat to the privacy of countless individuals," Arizona v. Gant, 556 U.S. 332, 345 (2009) (police may not search a car "whenever an individual is caught committing a traffic offense"). And, critically, it "gives police officers unbridled discretion" to decide which of those legally armed citizens will be targeted for frisks, implicating concerns about the abuse of police discretion that are fundamental to the Fourth Amendment. See id.; Black, 707 F.3d at 541. As Judge Hamilton warned in Williams, once a state legalizes the public possession of firearms, unchecked police discretion to single out anyone carrying a gun gives rise to "the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity." 731 F.3d at 694; see also Utah v. Strieff, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting) ("it is no secret that people of color are disproportionate victims" of special police scrutiny).

46

The government assures that we need not worry about these possible disproportionate effects because a Terry frisk may be conducted only after a stop on reasonable suspicion of "criminal activity" – an "objective standard" that "prevents police stops on hunches alone." Pet'n for Reh'g En Banc at 13. But that simply is not so, and to understand why not, we need look no further than the facts of this very case. Robinson was not stopped for "criminal activity," at least as that term generally is understood. As a legal matter, he was stopped because Officer Hudson observed a seatbelt violation – the kind of minor and routine traffic infraction that does next to nothing to narrow the class of legally armed citizens who may be subjected to a frisk at police discretion. And in reality, as Officer Hudson candidly testified at the suppression hearing, Robinson was stopped so that the police could investigate the tip they had received about a black male carrying a concealed firearm. Though Robinson's gun possession was presumptively lawful in light of West Virginia's generous public-carry laws, see Black, 707 F.3d at 540, that is, Robinson was stopped precisely because the police had a hunch that his possession in fact might be unlawful.

It is true, as the government argues, that under Whren v. United States, 517 U.S. 806 (1996), the Fourth Amendment permits this kind of pretextual traffic stop, undertaken in order to

47

explore some unsupported hunch. But that is exactly the problem: In light of Whren, the requirement that a valid stop precede a Terry frisk imposes no meaningful limit at all on police discretion. If the police in a public-carry jurisdiction want to target a particular armed citizen for an exploratory frisk, then they need do no more than wait and watch for a moving violation, as in this case – or a parking violation, see United States v. Johnson, 823 F.3d 408, 412 (7th Cir. 2016) (Hamilton, J., dissenting) (describing pretextual stop for "parking while black") reh'g en banc granted, opinion vacated (Aug. 8, 2016); or, for the pedestrians among us, a jaywalking infraction, as the government helpfully explained at oral argument – and then make a pretextual stop.

And we should be clear about the degree to which that pretextual stop may be leveraged into a wide-ranging and intrusive investigation. Cf. Strieff, 136 S. Ct. at 2069 (Sotomayor, J., dissenting) ("Although many Americans have been stopped for speeding or jaywalking, few may realize how degrading a stop can be when the officer is looking for more.") First, of course, is the frisk itself, euphemistically described as a "pat-down" but recognized, since Terry, as a "serious intrusion upon the sanctity of the person" that may extend to a thorough touching of sensitive and private areas of the body. Id. at 2070; Terry, 392 U.S. at 17 & n. 14. And under Michigan

48

v. Long, 463 U.S. 1032, 1049-50 (1983), reasonable suspicion that the subject of a vehicular stop is armed and dangerous may authorize not only a frisk of the suspect's person but also a "frisk" of the passenger compartment of the car. So with possession of a firearm in a public-carry state now enough to generate a reasonable suspicion of dangerousness, pretextual stops will allow police officers to target law-abiding gun owners not only for intrusive frisks but also limited car searches, at police discretion and on the basis of nothing more than a minor infraction. That is effectively the same result that the Supreme Court found unacceptable in Gant, 556 U.S. at 345 (forbidding car searches incident to arrest for minor traffic violations), and it should be no more acceptable here, where a right of constitutional dimension – the right to bear arms – is in the balance.

I recognize the serious concerns for officer safety that underlie the Terry frisk doctrine and the majority's opinion. Those concerns, as the majority points out, Maj. Op. at 12-13, may be especially pronounced during traffic stops, see, e.g., Mimms, 434 U.S. at 110-11 – though, of course, the majority's rule is not limited to the context of traffic stops. And I do not doubt that recent legal developments regarding gun possession have made the work of the police more dangerous as well as more difficult. See Williams, 731 F.3d at 694.

49

In my view, states have every right to address these pressing safety concerns with generally applicable and even-handed laws imposing modest burdens on all citizens who choose to arm themselves in public. For instance, many states – though not West Virginia – seek to reconcile police safety and a right to public carry through "duty to inform" laws, requiring any individual carrying a weapon to so inform the police whenever he or she is stopped,[4] or in response to police queries.[5] And if a person fails to disclose a suspected weapon to the police as required by state law, then that failure itself may give rise to a reasonable suspicion of dangerousness, justifying a protective frisk.

West Virginia, however, has taken a different approach, permitting concealed carry without the need for disclosure or temporary disarmament during traffic stops. For the reasons described above, I do not believe we may deem inherently "dangerous" any West Virginia citizen stopped for a routine traffic violation, on the sole ground that he is thought to have availed himself fully of those state-law rights to gun

---

[4] See, e.g., Alaska Stat. § 11.61.220; La. Stat. § 40:1379.3; Neb. Rev. Stat. § 69-2440; N.C. Gen. Stat. § 14-415.11; Okla. Stat. tit. 21, § 1290.8.

[5] See, e.g., Ariz. Rev. Stat. § 13-3112; Ark. Code § 5-73-315; 430 Ill. Comp. Stat. 66/10; S.C. Code § 23-31-215.

possession. Nor, in my view, does the Fourth Amendment allow for a regime in which the safety risks of a policy like West Virginia's are mitigated by selective and discretionary police spot-checks and frisks of certain legally armed citizens, by way of pretextual stops or otherwise. Cf. Delaware v. Prouse, 440 U.S. 648, 661 (1979) (invalidating discretionary spot-checks of drivers for licenses and registrations in furtherance of roadway safety). Absent some "specific, articulable suspicion of danger" in a particular case, see United States v. Sakyi, 160 F.3d 164, 168-69 (4th Cir. 1998), West Virginia's citizens, including its police officers, must trust their state's considered judgment that the benefits of its approach to public gun possession outweigh the risks. See Northrup, 785 F.3d at 1133.

## II.

The majority's rule is bright-line and broad: Any citizen carrying a gun in a public-carry jurisdiction is "armed" and also per se "dangerous" under Terry, regardless of surrounding circumstances. Maj. Op. at 18. The majority goes on, however, to consider the particular facts surrounding Robinson's stop, and concludes that they confirm a reasonable suspicion of dangerousness. Id. at 18-19. Though this portion of the

51

majority's opinion appears to be dicta unnecessary to its holding, I respectfully note my disagreement.

To be clear, I have no quarrel with the majority's premise: that under certain circumstances, even a lawfully possessed firearm can give rise to a reasonable suspicion of dangerousness. See Adams, 407 U.S. at 146. And so it is incumbent on me to consider whether the frisk in this case was justified in light not only of reasonable suspicion that Robinson was armed – insufficient by itself – but also of the surrounding circumstances. But like the magistrate judge who conducted Robinson's suppression hearing, I do not believe that either of the factors cited by the government and the majority – Robinson's presence in a high-crime neighborhood, or his "evasive response" when asked if he had a gun – is probative of dangerousness in the context of this case. Taking all of the circumstances together, I see no "particularized and objective basis" for believing that Robinson was dangerous as well as armed. See United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (internal quotation marks omitted).

The suppression hearing in this case was conducted by a magistrate judge, who heard testimony from all of the officers involved in the events leading up to Robinson's frisk. In recommending suppression, the magistrate judge evaluated the full circumstances surrounding Robinson's frisk, including both

the "high-crime" status of the apartment complex next to the 7-Eleven at which Robinson was seen loading his weapon and Robinson's conduct during the traffic stop. According to the magistrate judge, the testimony at the hearing indicated that Robinson was fully cooperative with the police, who perceived no "furtive gestures" or movements suggesting an intent to reach for a weapon. J.A. 131. And based on all of the evidence before him, the magistrate judge concluded that the government had failed to "articulate any specific fact, other than [Robinson's] possession of a firearm in a high crime neighborhood, a legal activity in the state of West Virginia, which would justify the officer's suspicion that [Robinson] was dangerous." Id. at 138.

The district court, of course, rejected the magistrate judge's report and recommendation and denied the suppression motion. But because the district court did not conduct a second hearing, this case must be decided on the record created before the magistrate judge. And on that record, I see no reason for second-guessing the magistrate judge's determination that the government's witnesses "testified to no objective and particularized facts demonstrating that [Robinson] was dangerous at the time of the traffic stop." Id. at 137.

It is true, as the magistrate judge carefully reviewed, that police officers provided testimony that an apartment

53

complex adjacent to the 7-Eleven at issue is considered a high crime area, and that crime from that complex often "spilled over" into the 7-Eleven parking lot where Robinson was seen, "as evidenced by shoplifting, thefts and drug trafficking activities." Id. at 130. And it is clear, as the magistrate judge recognized, that presence in a high-crime area may contribute to a finding of reasonable suspicion. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

But as our cases have indicated, the relative significance of a high-crime area, like other reasonable suspicion factors, is context-specific. In some cases, for instance, we have sustained a Terry frisk because it occurred in a high-crime area late at night. See, e.g., George, 732 F.3d at 300. In Black, however, we rejected a position substantially the same as the government's here: that even if public gun possession alone does not justify a Terry stop where the law permits the open carry of firearms, gun possession in a high-crime area would be sufficiently "suspicious" to do so. 707 F.3d at 542.

Black should govern here. Whether or not a high-crime environment might make other ambiguous conduct – for instance, fleeing from a police officer, see Wardlow, 528 U.S. at 124 – more likely to be criminal or dangerous, it sheds no light on the likelihood that an individual's presumptively legal gun possession poses a danger to the police. That is because where

54

public gun possession is permitted, high-crime areas are exactly the setting in which we should most expect to see law-abiding citizens carrying guns; there is more, not less, reason to arm oneself lawfully for self-defense in a high-crime area. Cf. McDonald, 561 U.S. at 790 ("[T]he Second Amendment right protects the rights of minorities and other residents of high-crime areas."). Presence in a high-crime area, in other words, is as likely an explanation for innocent and non-dangerous gun possession as it is an indication that gun possession is illegal or dangerous, and it does nothing to help the police tell the difference.

As discussed above, in states allowing the public possession of weapons, authorizing a Terry pat-down whenever there is reasonable suspicion that a person is armed, and in connection with a stop for any minor violation, would give the police unchecked discretion in deciding which armed citizens to frisk. Allowing such automatic frisks only in high-crime areas would do nothing to address that concern. Instead, it would guarantee that the costs of such intrusions are borne disproportionately by the racial minorities and less affluent individuals who today are most likely to live and work in neighborhoods classified as high-crime. See Black, 707 F.3d at 542. Given the lack of probative value associated with a high-crime area when it comes to gun possession, there is no

justification for adopting such a rule. "The new constitutional and statutory rights for individuals to bear arms at home and in public apply to all," and "[t]he courts have an obligation to protect those rights" in neighborhoods labeled "bad" as well as "good." Williams, 731 F.3d at 694 (Hamilton, J., concurring).

Apart from the high-crime neighborhood, the majority, like the government, puts primary reliance on Robinson's "evasive response" when asked by Captain Roberts whether he was carrying a firearm. Maj. Op. at 19. But according to the officers' testimony, Robinson was cooperative throughout his encounter with the police, and never made any inconsistent statements indicating nervousness. And the magistrate judge found – without dispute by the district court – that Captain Roberts's inquiry to Robinson came virtually simultaneously with the frisk itself: Roberts "asked [Robinson] if he had any firearms on his person as [Robinson] was exiting the vehicle," and upon perceiving a "weird look," ordered Robinson to place his hands on top of the car and conducted the frisk. J.A. 118. Even construing this evidence in the light most favorable to the government, there was a very limited time window during which Robinson could have responded before the frisk made the question moot, and his failure to interject an answer immediately did not

56

provide an objective indication that he was about to abandon his cooperative posture and become dangerous.[6]

That is particularly so given that West Virginia does not require that people carrying firearms inform the police of their guns during traffic or other stops, even if asked. See supra at 50. Where a state has decided that gun owners have a right to carry concealed weapons without so informing the police, gun owners should not be subjected to frisks because they stand on their rights. Cf. Northrup, 785 F.3d at 1132 ("impropriety" of officer's demand to see permit for gun being brandished in public is "particularly acute" where state has not only legalized open carry of firearms but also "does not require gun owners to produce or even carry their licenses for inquiring officers"). Under a different legal regime, different inferences could be drawn from a failure to answer an officer's question about a gun. See supra at 50-11. But I do not think we may presume dangerousness from a failure to waive – quickly

---

[6] The majority appears also to credit the "weirdness" of Robinson's look, as understood by Captain Roberts, as indicative of evasiveness or perhaps dangerousness itself. Maj. Op. at 19. On this point, I must agree with the magistrate judge: Captain Roberts's perception that through his look Robinson actually was saying, "[O]h, crap," "I don't want to lie to you, but I'm not going to tell you anything," J.A. 89, is sufficiently subjective that it cannot constitute an objective or articulable factor supporting reasonable suspicion of anything.

enough – a state-conferred right to conceal a weapon during a police encounter.

Again, I recognize that expanded rights to openly carry or conceal guns in public will engender genuine safety concerns on the part of police officers, as well as other citizens, who more often will find themselves confronting individuals who may be armed. But where a sovereign state has made the judgment that its citizens safely may arm themselves in public, I do not believe we may presume that public gun possession gives rise to a reasonable suspicion of dangerousness, no matter what the neighborhood. And because the rest of the circumstances surrounding this otherwise unremarkable traffic stop do not add appreciably to the reasonable suspicion calculus, I must conclude that the police were without authority to frisk Robinson under Terry's "armed and dangerous" standard. Accordingly, I dissent.